724 F.Supp. 110 (1989)
PAPER CORPORATION OF THE UNITED STATES, Plaintiff,
v.
SCHOELLER TECHNICAL PAPERS, INC., Defendant.
No. 89 Civ. 2504 (RWS).
United States District Court, S.D. New York.
October 11, 1989.
*111 Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., (Howard D. Scher, Stephen D. Ellis, of counsel), McCarter & English, New York City (Gita F. Rothschild, of counsel), for plaintiff.
Walter, Conston, Alexander & Green, P.C., New York City (Alan Kanzer, of counsel), for defendant.

OPINION
SWEET, District Judge.
Defendant Schoeller Technical Papers, Inc. ("Schoeller") has moved pursuant to Rule 12(b)(6), Fed.R.Civ.P., for an order dismissing the complaint of plaintiff Paper Corporation of the United States ("Paper Corporation"). For the reasons set forth below, the motion is granted in part and denied in part.

The Parties
Paper Corporation  a division of Paper Corporation of America, Inc.  is a Delaware corporation with its principal place of business in Valley Forge, Pennsylvania. Paper Corporation serves as an independent distributor of paper products. According to Paper Corporation, it expends its own resources to locate purchasers to buy its principals' products in exchange for its principals' commitment to supply the purchasers during a designated time period. Once it secures those commitments, Paper Corporation deals with the purchasers on its principals' behalf, places the purchasers' orders with its principals, arranges for its principals to ship the products directly to the purchasers, and charges the purchasers a mark-up over the price Paper Corporation pays to its principals.
Schoeller  a wholly owned subsidiary of Felix Schoeller Jr. Gmbh & Company Kg ("Schoeller Kg"), a West German corporation  is a business organization located in Pulaski, New York. Schoeller manufactures high quality specialty paper, primarily for the photographic and greeting card industries.

The Facts

A. The Greeting Card Business
Paper Corporation began distributing Schoeller products to manufacturers of "everyday greeting cards" (the "greeting card business") in 1964.
In 1986, Schoeller Kg allegedly promised Paper Corporation orally that it could continue to market Schoeller products in the greeting card business for a "minimum of eight to ten years." Despite that promise, Schoeller advised Paper Corporation in April 1987 that it was leaving the greeting card business immediately and would manufacture paper only for orders it already had acknowledged.
At the time, Paper Corporation had obtained approximately twenty-five accounts for Schoeller totalling $11,500,000 in annual sales. Of those customers, Hallmark *112 Cards Incorporated ("Hallmark") bought about 6,000 tons of paper per year, generating approximately $5,500,000 in annual sales. Schoeller's decision to cease its greeting card business prompted Hallmark to find other suppliers.
In August 1987, Schoeller informed Paper Corporation that it wanted to resume marketing paper to greeting card companies, although on a smaller scale. According to Paper Corporation, Schoeller confirmed in writing its commitment to sell 2,000 tons to Hallmark in the second half of 1988, 4,000 tons in 1989, and 3,000 tons in 1990. Several months later, Paper Corporation recommended that Schoeller allocate its entire output to Hallmark and represented that Hallmark would buy Schoeller's entire tonnage within one calendar year. At that time, Schoeller allegedly promised to supply Hallmark for at least five years. In response, Paper Corporation secured Hallmark's commitment to buy Schoeller's output for the next five years.
In January or February 1988, Schoeller determined to increase its profit margin on greeting card paper by thirty percent. Paper Corporation negotiated this increase with Hallmark, and Hallmark agreed to pay the higher price over the five year period and future price rises occasioned by increases in the price of pulp. Hallmark also allegedly agreed not to terminate its commitment without giving Paper Corporation at least one year's notice.
In March 1988, Hallmark agreed to buy 4,000 tons of greeting card paper in 1988 and requested the right of first refusal on Schoeller's entire output of greeting card paper in future years.
In June 1988, Schoeller allegedly guaranteed that Paper Corporation would continue to handle the Hallmark account as long as Paper Corporation continued to take a five percent profit margin.
On June 29, 1988, Schoeller sent Paper Corporation a letter enclosing internal Schoeller correspondence regarding "Pricing Structure Hallmark Grades." According to that enclosure, Schoeller had committed to supply Hallmark greeting card paper amounting to 4,000 tons in 1988, 6,000 tons in 1989, and 5,000 tons in "1990 and beyond." In a letter to Paper Corporation dated August 18, 1988, Schoeller "reiterated [its] commitment to supply Hallmark with greeting card paper" amounting to 4,000 tons in 1988, 6,000 tons in 1989, and 5,000 tons in 1990, 1991, and 1992, respectively.
In October and November 1988, Hallmark agreed to buy 4,000 tons of Schoeller paper in 1989. At the same time, Schoeller advised Paper Corporation that it wanted to increase its volume to Hallmark by 2,000 tons in 1989 and asked Paper Corporation what would have to be done to increase Hallmark's purchases. Paper Corporation approached Hallmark and determined that Hallmark would consent to the increase if it received an eight percent price reduction on any purchases over 4,000 tons. Schoeller agreed to these terms and allegedly assured Paper Corporation that it would continue to sell greeting card paper through Paper Corporation. In November and December 1988, Hallmark increased its purchases for 1989 to 5,000 tons.

B. The Polycoated Business
In 1979, Paper Corporation began distributing Schoeller polycoated paper products in markets other than the photographic paper market (the "polycoated business"). Paper Corporation's accounts in the polycoated business included the Minnesota Mining and Manufacturing Company ("3M") and Avery International Fasson Division ("Fasson").
Sometime in 1981, Schoeller determined to deal directly with 3M. Following several conversations and letters, Schoeller sent Paper Corporation a letter dated June 18, 1981 setting forth "a policy which will avoid continued discussion of this subject." That policy included the following elements:
1. After August 1, 1981, all orders for the grade MQ would be directed to Schoeller by 3M Purchasing. A separate grade designation will be used to differentiate MQ being ordered for current MR end-use from present alternate uses. We will send you a *113 copy of purchase orders relating to "[Paper Corporation] end use."
2. After each Traffic Control order has been completed and shipped, we will send you a check for your normal sales commission of 5.0%, as you suggested.
3. All marketing contact and future development work at 3M for any Schoeller products will be handled by [Schoeller] personnel.
4. Payment of a sales commission applies only to material purchased by the Traffic Controls Division of 3M for end uses which currently utilize MR.
5. This agreement would be subject to review on a three year basis, and would be renewable on August 1, 1984.
The letter concluded: "We look forward to your acceptance of this proposal so that we can continue with `business as usual,' which has benefitted both our companies in the past."
On August 3, 1981, Schoeller sent another letter concerning the 3M account. It set forth the policy "as altered through ... later discussions." That policy provided:
1. After August 1, 1981 all orders formerly designed by the Traffic Control Division of 3M as grade MR will be phased out with Schoeller MQ material replacing the MR grade. We will send you a copy of purchase orders relating to the release structure used by the Traffic Control Division for glass bead coating for their Reflective products. Orders coming into Schoeller for this end use will be involved with the Schoeller-[Paper Corporation] Agreement with the further stipulations as outlined below.
2. After each Traffic Control order has been completed and shipped, Schoeller will send a check for a sales commission of 5.0% to [Paper Corporation].
3. All marketing contacts and future development work at 3M for any Schoeller products will be handled by [Schoeller] personnel.
4. Payments of a sales commission applies only to material purchased by the Traffic Control Division of 3M for the resin coated release liner for glass bead coating for their manufacture of reflective design products.
5. This agreement will terminate after a six year period starting August 1, 1981. A termination date will be August 1, 1987 with all product shipped prior to that date being a part of this agreement.
The concluding paragraph stated: "In order that we have no further delays in accomplishing the objectives as outlined, we would like your written agreement to our proposal as soon as possible."
Paper Corporation responded in a letter dated August 5, 1981. That letter set forth Paper Corporation's views as follows:
You will recall when you first installed poly-coating equipment, you asked us to try and develop industrial business other than photographic, and we did so. Our only mistake, apparently, was in developing business at 3M Company. We understand they have put severe pressure on you to buy direct and even threatened the loss of the photographic business if you did not comply. Our normal position with a source of supply is that we both experience the loss if a customer demands to buy direct under threat of loss of the business. However, this is complicated with the additional threat of the loss of the photographic business, and we, thus, reluctantly accept your offer of settlement as outlined in the above letter.
We do so with the understanding that should any of our other customers demand to buy direct, you would abide by our policy that we both experience the loss rather than give in to such a threat.
Paper Corporation alleges that Schoeller subsequently complied with its demands. Thus, when Fasson requested that Schoeller distribute its products directly rather than through Paper Corporation, Schoeller refused.

*114 C. Paper Corporation's Termination
In January 1989, Schoeller advised Paper Corporation that it was terminating the distributor relationship and that thereafter it would market its products directly. A letter dated January 16, 1989 detailed the terms of Paper Corporation's termination:
1. Hallmark

All outstanding purchase orders from [Paper Corporation] for shipments to Hallmark will be fulfilled by [Schoeller].
All future sales to Hallmark will be direct. Schoeller will pay [Paper Corporation] their standard mark-up as commission for quantities sold to Hallmark through April 30, 1989. If the transition to direct sales to Hallmark takes place smoothly, Schoeller will extend the commission payments to an additional three months. The option to do this will be solely at Schoeller's discretion.
2. Fasson

Schoeller will sell the Fasson grades directly to Fasson at the price and terms that were negotiated for 1989. In order to soften the financial impact to [Paper Corporation], Schoeller agrees to pay [Paper Corporation] the present mark-up as commission for all sales in 1989 to Fasson.
3. New Business

Schoeller will allow [Paper Corporation] until the end of this month, to secure a commitment from American Greeting Company for 1989 business. If [Paper Corporation] can obtain this commitment, then Schoeller will pay a reasonable commission on such sales and will allow [Paper Corporation] a reasonable opportunity to obtain future commitments from American Greeting for business in 1990 and 1991.
Beginning February 1989, Schoeller will begin to conduct its own marketing and sales of Greeting Card papers excluding the new business that may be secured by [Paper Corporation] this month.
Schoeller detailed its arrangement with Fasson in a February 9, 1989 letter to Paper Corporation.
Through its counsel, Paper Corporation objected to the termination. That letter provided:
On behalf of [Paper Corporation], we acknowledge receipt of your letter of January 18, 1989 and the subsequent correspondence from your company. We reserve all of our client's rights arising under and pursuant to its relationship with Schoeller and specifically advise you that the [Paper Corporation] does not consent or agree to the cancellation or modification of the commitments made by Schoeller. [Paper Corporation] expects Schoeller to honor all of its commitments to [Paper Corporation] including its commitment to ship product to [Paper Corporation's] customers pursuant to [Paper Corporation's] purchase orders in the quantities and at the prices agreed upon without attempting to interfere with [Paper Corporation's] relations with its customers by obtaining orders, directly or indirectly.
According to Paper Corporation, the two companies had a contract requiring Schoeller "to continue to sell its products through [Paper Corporation] to customers secured by [Paper Corporation] for such products [in the greeting card and polycoated businesses] so long as such customers continued purchasing such products." Complaint ¶ 41. Schoeller argues that it had a "business relationship"  not a contractwith Paper Corporation, and that it has not designated Paper Corporation the exclusive distributor for any of its products.

Prior Proceedings
When Schoeller persisted with its plan to sell its products directly, Paper Corporation brought this action, alleging causes of action for breach of contract (Count I), promissory estoppel (Counts II through V), and tortious interference with business relations (Count VI). On May 19, 1989, Schoeller moved pursuant to Rule 12(b)(6), Fed.R. Civ.P., for an order dismissing the complaint in its entirety. Oral argument was *115 heard and the court considered the motion fully submitted on July 14, 1989.

Discussion

A. Standards for a Motion to Dismiss
A court should dismiss a complaint for failure to state a claim under Rule 12(b)(6), Fed.R.Civ.P., only if it appears beyond doubt that the plaintiff can prove no set of facts supporting its claim that entitles it to relief. See H.J. Inc. v. Northwestern Bell Tel. Co., ___ U.S. ___, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 (1989); Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); Dahlberg v. Becker, 748 F.2d 85, 88 (2d Cir.1984), cert. denied, 470 U.S. 1084, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985). A court must construe the complaint's allegations in the light most favorable to the plaintiff and accept those allegations as true. See Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); Dacey v. New York County Lawyers' Assoc., 423 F.2d 188, 191 (2d Cir.1969), cert. denied, 398 U.S. 929, 90 S.Ct. 1819, 26 L.Ed.2d 92 (1970).

B. The Statute of Frauds

1. Contracts for Longer Than One Year
Schoeller contends that New York's Statute of Frauds bars Paper Corporation's breach of contract and promissory estoppel claims. That statute provides:
Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:
1. By its terms is not to be performed within one year from the making thereof ...

N.Y.Gen.Oblig. Law, § 5-701 (McKinney 1989).
Paper Corporation argues that the Statute of Frauds does not apply here because the alleged contract could be performed within one year. According to Paper Corporation, the contract requires Schoeller to distribute its products through Paper Corporation so long as Paper Corporation's customers continue purchasing Schoeller's products. Conceivably, Paper Corporation's customers could cease their purchases within one year, thereby relieving Paper Corporation and Schoeller of their obligations under the contract. For support, Paper Corporation cites North Shore Bottling Company v. C. Schmidt & Sons, Inc., 22 N.Y.2d 171, 239 N.E.2d 189, 292 N.Y.S.2d 86 (1968). In that case, the Court of Appeals held that the Statute of Frauds did not apply to "an agreement whereby plaintiff became the exclusive wholesale distributor in Queens County of Schmidt beer ... for as long as Schmidt sold beer in the New York metropolitan area." Id. 239 N.E.2d 189, 292 N.Y.S.2d at 89.
However, North Shore does not apply here. There, the defendant retained the power to terminate the contract within one year by ceasing to distribute beer in the New York metropolitan area. Here, the alleged contract could be fully performed within one year only if Paper Corporation's customers  who themselves are not parties to the contract  stop buying Schoeller's products. Under New York law:
"A service contract of indefinite duration, in which one party agrees to procure customers or accounts or orders on behalf of the second party, is not by its terms performable, within a year  and hence must be in writing  since performance is dependent, not upon the will of the parties to the contract, but upon that of a third party." (Citations omitted).
Zupan v. Blumberg, 2 N.Y.2d 547, 141 N.E.2d 819, 161 N.Y.S.2d 428, 429 (1957); accord Martocci v. Greater New York Brewery, Inc., 301 N.Y. 57, 92 N.E.2d 887 (1950); Jillcy Film Enters., Inc. v. Home Box Office, Inc., 593 F.Supp. 515 (S.D.N.Y. 1984).
Thus, the Statute of Frauds applies, and the inquiry turns to whether the contract complies with that law's requirements.

2. Contract Memorialized in a Writing Subscribed by the Party to be Charged
A contract within the Statute of Frauds must be memorialized in a writing "subscribed *116 by the party to be charged." N.Y. Gen.Oblig. Law § 5-701 (McKinney 1989); see also Morris Cohon & Co. v. Russell, 23 N.Y.2d 569, 245 N.E.2d 712, 297 N.Y.S.2d 947, 953 (1969). New York's Statute of Frauds "does not require the memorandum ... to be in one document. It may be pieced together out of separate writings, connected with one another either expressly or by the internal evidence of subject matter and occasion." Crabtree v. Elizabeth Arden Sales Corp., 305 N.Y. 48, 110 N.E.2d 551 (1953). The "separate writings" may include correspondence between the parties, as well as the defendant's internal memoranda. See Shapiro v. Dictaphone Corp., 66 A.D.2d 882, 411 N.Y.S.2d 669, 672 (2d Dep't 1978).
Having pieced together these materials, the resulting writing "must contain substantially the whole agreement and all its material terms and conditions, so that one reading it can understand it from what the agreement is." Mentz v. Newwitter, 122 N.Y. 491, 497, 25 N.E. 1044 (1890). "A term is `essential,' and must thus appear in the `memorandum,' if it seriously affects the rights and obligations of the parties and there is a significant evidentiary dispute as to its content." Ginsberg Mach. v. J. & H. Label Processing Corp., 341 F.2d 825, 828 (2d Cir.1965). An omission of even one essential term "is fatal to the contention that the writings satisfy the Statute of Frauds." Kobre v. Instrument Sys. Corp., 54 A.D.2d 625, 387 N.Y.S.2d 617, 619 (1st Dept.1976), aff'd, 43 N.Y.2d 862, 374 N.E.2d 131, 403 N.Y.S.2d 220 (1978).
Paper Corporation has appended to its complaint the documents that it contends contain the contract's essential terms. For purposes of this motion, the critical term involves Schoeller's alleged agreement not to sell directly to customers Paper Corporation has recruited and serviced. The relevant excerpts from the documents provide:
 In a June 22, 1981 letter from Schoeller to Paper Corporation, Schoeller set forth the terms under which Schoeller would commence dealing directly with 3M. The letter stated: "I do not believe there is anything to be gained by restating Schoeller's position in this matter as [Paper Corporation is] well aware of this position.... [W]hat is important is that we agree on a policy which will avoid continued discussion of this subject." The letter concluded: "We look forward to your acceptance of this proposal so that we can continue with `business as usual,' which has benefited both our companies in the past."
 Schoeller set forth a revised proposal regarding the 3M contract in a letter to Paper Corporation dated August 3, 1981. That letter stated: "In order that we have no further delays in accomplishing the objectives as outlined, we would like your written agreement to our proposal as soon as possible. If you are in agreement with our proposal as outlined, we will keep the August 1, 1981 date as a starting point of this agreement."
 In a letter to Paper Corporation dated June 29, 1989, Schoeller confirmed its "4 percent price increase on Greeting Card stock to [Paper Corporation] effective 7/1/88...." The letter also enclosed "a copy of our internal discussions at Schoeller which show the pricing structure through April of 1989 per the Hallmark agreement." The enclosure referred to "the agreement reached with Hallmark," set forth the new pricing structure, and stated that Schoeller had "guaranteed" to Hallmark certain quantities through "1990 and beyond." The enclosure's last paragraph stated: "Bob Fitzgerald [of Paper Corporation] will visit our plant on July 12th, and we will review this pricing schedule, plus the Fasson Reflective Division project at that time."
 An August 18, 1988 letter from Schoeller to Paper Corporation "reiterate[d] [Schoeller's] commitment to supply Hallmark with greeting card paper" amounting to 4,000 tons in 1988, 6,000 tons in 1989, and 5,000 tons in 1990, 1991, and 1992, respectively. The letter added: "As you know for the year 1988, we are somewhat behind schedule. In order to make the 4000 metric *117 ton commitment, we have to ship an average of 550 tons per month. We appreciate your help in ensuring that these shipments will come to pass as expected. In order to avoid any stock outs or overstocking, we also need some type of detailed shipment forecast."
Paper Corporation contends that these documents constitute a writing signed by Schoeller setting forth an agreement by which Paper Corporation "was to be Schoeller's exclusive sales representative for both greeting card and nonphotographic polycoated paper...." Paper Corp. Mem. in Opp. at 15.
This interpretation states the contract too broadly, however. Although Schoeller's letters concerning the 3M account could be interpreted as a statement that Schoeller's direct distribution to Paper Corporation's customers is different from "business as usual"i.e., distribution through Paper Corporation  the only customers whose names appear anywhere in the writings are 3M, Fasson, and Hallmark. The documents establish that Paper Corporation consented to Schoeller's dealing directly with 3M, thereby barring Paper Corporation from challenging Schoeller's conduct concerning that account. Schoeller's internal memorandum refers to Fasson, but no writing sets forth key terms such as duration, price, or volume regarding Fasson's purchases. Indeed, Schoeller's internal memorandum indicates that the parties plan to "review" the Fasson project. Moreover, the documents fail even to mention other accounts Paper Corporation has established for Schoeller. Thus, the Statute of Frauds bars Paper Corporation's breach of contract claim concerning Schoeller's practice of dealing directly with these customers.
However, whether these documents constitute a signed writing sufficient to satisfy the Statute of Frauds regarding Hallmark is a much closer question  too close for a court to resolve as a matter of law on a motion to dismiss, which requires a court to draw all inferences in favor of the nonmoving party. Taken together, Schoeller's letters could be interpreted at least as a commitment to supply Hallmark  through Paper Corporation exclusively  greeting card paper amounting to 4,000 tons in 1988, 6,000 tons in 1989, and 5,000 tons in 1990, 1991, and 1992, respectively.

3. Part Performance
Paper Corporation contends that its part performance renders the Statute of Frauds inapplicable. Under New York law, "[p]art performance that is clear, certain and definite in object and design as to be unequivocally referable to the agreement, and which will precipitate a fraud if the agreement is not enforced, removes the action from the defense of the statute of frauds." Dietze v. Patterson, 1989 WL 31483, at 3 (S.D. N.Y. Mar. 30, 1989) (citations omitted).
According to Paper Corporation, its "continuing representation of Schoeller in successfully negotiating terms with Hallmark, including securing Hallmark's agreement to price and quantity terms requested by Schoeller, are explainable only with reference to the agreement alleged in the Complaint" and "[f]ailure to enforce the agreement which the parties clearly intended and recognized through their conduct will precipitate a fraud upon [Paper Corporation]." Paper Corp.Mem. in Opp. at 16.
To the extent Paper Corporation appears to limit its part performance argument to the Hallmark account, there is no need to address that issue at this point because the discussion set forth above determined that a factual issue remains regarding whether the writings satisfy the Statute of Frauds.
To the extent Paper Corporation attempts to invoke part performance to avoid the Statute of Frauds' application to its other accounts, that attempt must fail. The part performance alleged is not "unequivocally referable to the agreement." Dietze, 1989 WL 31483, at 3. The conduct also is consistent with Paper Corporation being a non-exclusive representative for Schoeller or an exclusive representative whose agreement is terminable at will. See Cunnison v. Richardson Greenshields Sec., Inc., 107 A.D.2d 50, 485 N.Y.S.2d 272, *118 276 (1st Dep't 1985). "If ... an act is equally consistent with an explanation having a basis in other than the alleged oral agreement, the part performance relied upon will not remove the agreement from the bar of the Statute of Frauds.").
Accordingly, Schoeller's motion to dismiss Paper Corporation's breach of contract claim is denied regarding sales to Hallmark, but granted concerning sales to all other customers.

C. Promissory Estoppel
Counts II through V allege claims for promissory estoppel. According to Paper Corporation, Schoeller made several "clear and definite" promises, including:
"that [Schoeller] would not agree to sell direct to any of the customers for Schoeller products which had been or would be secured and serviced by [Paper Corporation] in connection with its agency agreement with Schoeller." (Count II  Complaint ¶ 46).
"that [Schoeller] would continue to sell products in the greeting card market through [Paper Corporation] for an additional eight to ten years." (Count IIIComplaint ¶ 52).
"that [Schoeller] would produce greeting card paper to be sold to Hallmark through [Paper Corporation], for a period of at least five additional years." (Count IV  Complaint ¶ 59).
 that Schoeller would "sell to Hallmark, through [Paper Corporation], 4000 tons in 1988, 6000 tons in 1989, and 5000 tons per year in 1990 and all future years in which Hallmark continued to purchase Schoeller products through [Paper Corporation]" and further that Schoeller would "sell to Hallmark through [Paper Corporation] through 1992." (Count VComplaint ¶¶ 64, 65).
Paper Corporation contends that it relied to its detriment on each of these promises, thereby suffering "substantial damages in the form of sums expended in developing and maintaining business for Schoeller products, lost profits on such business, lost business opportunities, and injury to its business reputation and goodwill." Complaint ¶¶ 49, 56, 61, and 69.
In essence, Paper Corporation's claims for promissory estoppel restate Count I's breach of contract cause of action as individual promises detrimentally relied upon. As noted above, the Statute of Frauds bars as a matter of law Paper Corporation's claims relating to all its accounts, except the Hallmark account  for which a factual issue remains whether the writings satisfy the Statute of Frauds. As the Second Circuit has stated:
The strongly held public policy reflected in New York's Statute of Frauds would be severely undermined if a party could be estopped from asserting it every time a court found that some unfairness would otherwise result. For this reason, the doctrine of promissory estoppel is properly reserved for the limited class of cases where "the circumstances are such as to render it unconscionable to deny" the promise upon which the plaintiff has relied.
Philo Smith & Co., Inc. v. USLIFE Corp., 554 F.2d 34, 36 (2d Cir.1977) (emphasis in original) (citation omitted).
Paper Corporation has alleged no facts that would establish an "unconscionable" injury supporting its claims for promissory estoppel, particularly in light of other cases rejecting similar claims.
In D & N Boening, Inc. v. Kirsch Beverages, Inc., 99 A.D.2d 522, 471 N.Y.S.2d 299 (2d Dep't), aff'd, 63 N.Y.2d 449, 472 N.E.2d 992, 483 N.Y.S.2d 164 (1984), for example, the Appellate Division decided a case raising substantially similar issues. There, the plaintiff claimed to have an oral subdistributorship that was to continue so long as the plaintiff and its predecessors "satisfactorily distributed the product, exerted their best efforts and acted in good faith." Twenty-seven years after the oral agreement allegedly was made, the distributor terminated the subdistributorship. The plaintiff sued for promissory estoppel, claiming that the defendant's promises induced it to "structure its growth around Yoo-Hoo as its prime beverage, to invest considerable sums of cash in plant and *119 capital equipment, to increase its payroll and to forego other possible beverage distributorships." 471 N.Y.S.2d at 302. Ruling that this reliance was insufficient, the Appellate Division stated:
However, all of these acts took place over the 27-year period during which plaintiff's and its predecessors' agreement with defendants and their predecessor remained in effect. The lengthy duration of the agreement points to the fact that plaintiff and its predecessors derived a substantial income from Yoo-Hoo sales throughout.
* * * * * *
In sum, this is not a case where a promisee was induced to act upon an unfulfilled promise. It is clear that both sides to the agreement herein continued to perform and derive benefits for almost three decades before the agreement was terminated. In our view, such circumstances are not so egregious as to render unconscionable the assertion of the Statute of Frauds.
Id.; see also Rosenthal v. Kingsley, 674 F.Supp. 1113, 1125 (S.D.N.Y.1987) ("an injury that is solely the result of non-performance of that void agreement is not sufficiently `unconscionable' to allow a party to estop reliance on the Statute of Frauds defense"); Country-Wide Leasing Corp. v. Subaru of Am., Inc., 133 A.D.2d 735, 520 N.Y.S.2d 24, 25 (2d Dept.1987) ("the mere failure to obtain an uncertain prospective benefit does not rise to a sufficient level of unconscionability to warrant the application of the doctrine of promissory estoppel"), appeal denied, 70 N.Y.2d 615, 521 N.E.2d 443, 526 N.Y.S.2d 436 (1988); Ginsberg v. Fairfield-Noble Corp., 81 A.D.2d 318, 440 N.Y.S.2d 222, 223 (1st Dep't 1981) ("the choice to forego current employment because of rosy promises `does not put the stigma of unconscionability upon the defendants' right to assert the Statute of Frauds'").
Thus, Counts II through V alleging promissory estoppel are dismissed.

D. Tortious Interference With Business Relations
In Count VI of its complaint, Paper Corporation charges Schoeller with tortious interference with business relations, alleging that by determining to distribute its products directly Schoeller "intentionally induced all of [Paper Corporation's] customers for Schoeller products to repudiate their commitments to purchase Schoeller products through [Paper Corporation]." Complaint ¶ 75. Paper Corporation further alleges that Schoeller's conduct was "wanton, willful and outrageous." Id. ¶ 77.
To state a cause of action for tortious interference with business relations:
a plaintiff is required to show "the defendant's interference with business relations existing between the plaintiff and a third party, either with the sole purpose of harming the plaintiff or by means that are `dishonest, unfair or in any other way improper.'" If the defendant's interference is intended, at least in part, to advance its own competing interests, the claim will fail unless the means employed include criminal or fraudulent conduct. (Emphasis in original) (Citations omitted).
PPX Enters., Inc. v. Audio Fidelity Enterps., Inc., 818 F.2d 266, 269 (2d Cir.1987); see also Volvo N. Am. v. Men's Int'l Professional Tennis Council, 857 F.2d 55, 74 (2d Cir.1988), Robert J. McRell Assocs. v. Insurance Co. of N. Am., 677 F.Supp. 721, 729 (S.D.N.Y.1987); Strapex Corp. v. Metaverpa, N.V., 607 F.Supp. 1047, 1050 (S.D. N.Y.1985).
Paper Corporation does not allege facts indicating that Schoeller's alleged interference was "with the sole purpose of harming the plaintiff." Indeed, the only facts bearing on Schoeller's motivation indicate that Schoeller may have acted principally for its own economic interest in response to Paper Corporation's customers' demands. When Schoeller began dealing directly with 3M in 1981, Paper Corporation stated in a letter:
We understand [3M has] put severe pressure on you to buy direct and even threatened the loss of the photographic business if you did not comply. Our normal position with a source of supply is that we both experience the loss if a *120 customer demands to buy direct under threat of loss of the business. However, this is complicated with the additional threat of the loss of the photographic business, and we, thus, reluctantly accept your offer of settlement as outlined in the above letter.
Moreover, Paper Corporation alleges no facts indicating that Schoeller engaged in "dishonest," "criminal," or "fraudulent conduct." Paper Corporation contends that Schoeller's actions were "wanton, wilful and outrageous" (Complaint ¶ 77), but such conduct is not actionable in New York. In Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 50 N.Y.2d 183, 406 N.E.2d 445, 428 N.Y.S.2d 628, 632 (1980), the New York Court of Appeals held that the "wrongful means" that a party may not employ to compete for business are "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract."
Because plaintiff fails to state a claim for tortious interference with business relations, its sixth claim for relief is dismissed.

Conclusion
For the reasons set forth above, Schoeller's motion to dismiss is granted in part and denied in part. Settle judgment on notice.
The parties are directed to complete discovery within ninety (90) days and to file the pretrial order on January 10, 1990.
It is so ordered.