PAPER CORPORATION OF the
UNITED STATES, Plaintiff,

v.

SCHOELLER TECHNICAL PAPERS,
INC., Defendant.

No. 89 Civ. 2504 (RWS).

United States District Court,
S.D. New York.

Sept. 17, 1991.

See also 759 F.Supp. 1039.

Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa. (Howard D. Scher, Stephen D. Ellis, of counsel), and McCarter & English, New York City (Gita F. Rothschild, of counsel), for plaintiff.

Walter, Conston, Alexander & Green, P.C., New York City (Alan Kanzer, Stephen S. Hart, of counsel), for defendant.

## OPINION

SWEET, District Judge.

Defendant Schoeller Technical Papers, Inc. ("Schoeller") has moved pursuant to Rule 56, Fed.R.Civ.P. for summary judgment dismissing the two remaining counts in the Amended Complaint of plaintiff Paper Corporation of the United States ("Paper Corporation"). For the reasons set forth below, the summary judgment motion is denied.

### The Parties

Paper Corporation—a division of Paper Corporation of America, Inc.—is a Delaware corporation with its principal place of business in Valley Forge, Pennsylvania. Paper Corporation serves as an independent distributor of paper products.

Schoeller—a wholly owned subsidiary of Felix Schoeller Jr. Gmbh & Company Kg ("FSG") a German Corporation—is a business organization located in Pulaski, New York. Schoeller manufactures high quality special paper that is used by the photographic industry, greeting card manufacturers, and others.

### Prior Proceedings

This action, which Paper Corporation commenced on April 13, 1989, arises out of a dispute relating to an alteration in the relationship between the two companies. Paper Corporation's original complaint (the "Complaint") alleged breach of contract, promissory estoppel and tortious interference with business relations.

On May 19, 1989, Schoeller moved, pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the Complaint. In an opinion of October 11, 1989 ("Schoeller I"), the court dismissed the Complaint, except for that portion of the breach of contract claim which related to sales of greeting card paper to Hallmark. While the court found that the alleged Hallmark agreement came within the scope of the Statute of Frauds as it could not be performed within one year, the court did not dismiss the Hallmark claim at that time because of uncertainty as to whether the agreement as adequately memorialized:

> However, whether these documents [Exhibits 3 and 4 to the Complaint] constitute a signed writing sufficient to satisfy the Statute of Frauds regarding Hallmark is a much closer question—too close for the court to resolve as a matter of law on a motion to dismiss, which requires a court to draw all inferences in favor of the nonmoving party. Taken together, Schoeller's letters could be interpreted at least as a commitment to supply Hallmark—through Paper Corporation exclusively—greeting card paper amounting to 4,000 tons in 1988, 6,000 in 1989, and 5,000 tons in 1990, 1991, and 1992, respectively.

*Schoeller I,* 724 F.Supp. 110, 117 (S.D.N.Y.1989).

On January 11, 1990, Paper Corporation amended its complaint (the "Amended Complaint"). The Amended Complaint alleged breach of contract, fraud, *quantum meruit,* promissory estoppel, tortious interference with business relations and unfair competition.

Schoeller moved pursuant to Rule 12(b)(6) to dismiss all counts of the Amended Complaint except for Count II, which related to the Hallmark claim described

above. In an opinion of July 10, 1990 ("Schoeller II") the court dismissed all the challenged counts of the Amended Complaint with the exception of the *quantum meruit* claim, which it allowed to be pled in the alternative. *Schoeller II*, 742 F.Supp. 808, 812 (S.D.N.Y.1990).

On November 19, 1990, Paper Corporation moved for leave to file a second amended complaint, in which it sought to replead all of the previously dismissed claims, as well as to allege the surviving portions of the Amended Complaint. In an Opinion of March 26, 1991 ("Schoeller III"), 759 F.Supp. 1039, the court denied Paper Corporation leave to amend.

On May 9, 1991, Schoeller filed the instant summary judgment. Oral argument was heard on May 23, 1991, and the motion was considered fully submitted as of that date.

*The Facts*

The business relationship between Paper Corporation and Schoeller, pursuant to which Paper Corporation acted as the sales agent for Schoeller's greeting card paper (the "greeting card business"), began in 1964 and continued until early 1989, when it was terminated by Schoeller.

As sales agent for Schoeller greeting card paper, Paper Corporation developed substantial business with purchasers of such paper, including Hallmark Cards Inc. ("Hallmark"). Paper Corporation procured orders from Hallmark, purchased paper from Schoeller and resold it to Hallmark to fill such orders. Hallmark would on an annual basis communicate to Paper Corporation its commitment to certain volume requirements over the approaching year, and Paper Corporation would communicate that information to Schoeller. The only manner in which Hallmark ordered Schoeller paper from Paper Corporation was in purchase orders that it submitted to Paper Corporation. Hallmark also relied upon Paper Corporation to resolve quality problems with Schoeller.

Paper Corporation derived no compensation from Schoeller during the course of this business relationship; rather, Paper Corporation's profit consisted of the differential between the price it paid Schoeller for Schoeller paper and the price it charged Hallmark for that paper.

As stated above, Schoeller is a wholly-owned subsidiary of FSG, a German corporation. Before February 1986, FSG had only a 50% interest in Schoeller, with Mead Corporation ("Mead") owning the other half. In February, 1986, Mead sold its interest in Schoeller to FSG.

In the spring of 1987, Hans Michael Gallenkamp ("Gallenkamp"), the chief executive officer of FSG as well as the chairman of the board of Schoeller, and FSG became aware of increased demand for the photographic paper produced by FSG. To fill that demand, FSG management determined to commit Schoeller to producing photographic paper rather than greeting card paper. Gallenkamp accordingly asked Schoeller's then president, Richard O. Gall ("Gall") to arrange for Paper Corporation to announce to its customers, including Hallmark, that Schoeller intended to stop producing greeting card papers. When it later became clear that Schoeller would not be experiencing as much increased demand in the photographic paper business as anticipated, Schoeller management decided that Schoeller would have to attempt reentry into the greeting card business, but would this time produce smaller quantities of greeting card paper. Schoeller asked Paper Corporation to effect reentry.

A Hallmark internal memorandum of July, 1987 reflects Schoeller's commitment to provide certain maximum quantities to Hallmark through 1990, as communicated to Hallmark through Robert F. Fitzgerald ("Fitzgerald"), the President of Paper Corporation.

A letter from Gall of August 24, 1987 sets forth Schoeller's agreement to sell certain maximum volumes to Hallmark through Paper Corporation through 1990.

In a letter of March 14, 1988, Paul Gibbs ("Gibbs") of Hallmark wrote to Fitzgerald stating that Hallmark was "pleased that we will continue to do business with you [Paper Corporation] and the Schoeller Mill," and that he hoped "that the agree-

ment that we worked out will be beneficial to both of us." The agreement to which Gibbs was referring was a pricing agreement that Paper Corporation had negotiated with Hallmark on behalf of Schoeller. The agreement permitted a series of price increases. A letter of June 29, 1988 from Arlon F. King ("King") of Schoeller to Fitzgerald refers to this agreement as does a letter of March 14, 1988 from Jim Woods ("Woods") of Hallmark to Fitzgerald.

In June 1988, Gerald Kempner ("Kempner") replaced Gall as President of Schoeller.

In a letter of August 18, 1988, Schoeller advised Paper Corporation of Schoeller's commitment to supply Hallmark with specified quantities of paper, set forth in metric tons, through the end of 1992. The letter did not specify prices.

In a letter of August 23, 1988, Paper Corporation informed Schoeller that Hallmark had not yet conveyed a "firm commitment" for paper purchases beyond 1988, and that discussions with Hallmark regarding quantities had been in reference to short, rather than metric, tons. A metric ton is 10.2% larger than a short ton, containing 2,204 pounds rather than 2,000 pounds.

Hallmark had not yet made a firm commitment to purchase specific quantities of Schoeller paper beyond 1988 because it was concerned about possible rises in Schoeller's prices after February 1, 1989.

The parties met, together with Hallmark, on September 30, 1988, and discussed the question of Hallmark's committing to purchase specific quantities of Schoeller paper beyond 1988, but did not reach a resolution of this question at the meeting.

The parties met again, together with Hallmark, on November 30, 1988, and again discussed the quantities that Hallmark would purchase beyond 1988. On this same date, Schoeller asked Hallmark if it would be interested in purchasing directly from Schoeller. Hallmark responded affirmatively. This was confirmed at a meeting on January 6, 1989.

In a letter of December 12, 1988, Hallmark informed Paper Corporation that it still had not yet determined its 1989 tonnage requirements.

As of January 1989, Paper Corporation had not placed purchase orders for Schoeller greeting card paper for delivery beyond March 1989.

On January 9, 1989, Schoeller communicated its price increases under the March 1988 agreement to Paper Corporation, and listed prices for "Paper Corporation of the United States" to be "effective on all orders shipped after February 1, 1989."

*Discussion*

*I. Summary Judgment Standard*

Under Rule 56, a motion for summary judgment shall be granted when the moving party demonstrates as a matter of law that he is entitled to that remedy because there are no genuine issues of material fact present in the action. *H.L. Hayden Co. v. Siemens Medical Systems, Inc.*, 879 F.2d 1005, 1011 (2d Cir.1989). The moving party, however, has the burden of demonstrating the absence of any genuine issue as to all the material facts, and the non-moving party is entitled to all favorable inferences that may be drawn from the evidence. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 444–45 (2d Cir.1980).

With respect to the breach of contract claim, if, as Schoeller contends, the Statute of Frauds as a matter of law bars Paper Corporation's contract claim, then summary judgment must be granted. If, however, the applicable statute of frauds does not bar the claim, then the court will consider whether there are any other issues of fact which preclude a grant of summary judgment at this time. With respect to the *quantum meruit* claim, if, as a matter of law, Paper Corporation cannot recover on the basis of quasi-contract, then Schoeller's summary judgment motion must be granted. If, however, Paper Corporation can recover as a matter of law on this theory, then the court will consider whether there are any issues of facts as to the existence of an implied contract under the *quantum meruit* theory.

II. *The Breach of Contract Claim*

A. Applicable Statute of Frauds

As a preliminary matter to the question of whether the Statute of Frauds as a matter of law prohibits enforcement of the agreement, the court must determine which Statute of Frauds applies.

New York's General Obligations Law § 5–701 ("GOL § 5–701") (McKinney's 1991) provides, in pertinent part:

> Every agreement promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement promise or undertaking:
>
> 1. By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime.

*Schoeller I* set forth the requirements of GOL § 5–701:

> Having pieced together these material, the resulting writing "must contain substantially the whole agreement and all its material terms and conditions, so that one reading it can understand from it what the agreement is." *Mentz v. Newwitter*, 122 N.Y. 491, 497, 25 N.E. 1044, 1046 (1890). "A term is 'essential,' and must thus appear in the 'memorandum,' if it seriously affects the rights and obligations of the parties nd there is a significant evidentiary dispute as to its content." *Ginsberg Mach. v. J. & H. Label Processing Corp.*, 341 F.2d 825, 828 (2d Cir.1965). An omission of even one essential term "is fatal to the contention that the writings satisfy the Statute of Frauds." *Kobre v. Instrument Sys. Corp.*, 54 A.D.2d 625, 626, 387 N.Y.S.2d 617, 619 (1st Dep't 1976), *aff'd*, 43 N.Y.2d 862, 374 N.E.2d 131, 403 N.Y.S.2d 220 (1978).

*Schoeller I*, 724 F.Supp. at 116.

New York's Uniform Commercial Code § 2–201 (McKinney's 1991) (the "Uniform Commercial Code"), which applies specifically to the sale of goods, provides that in order for a contract for the sale of goods to be enforceable, there must be "some writ-ing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought ..." Section 2–201 further states that "[a] writing is not insufficient because it omits or incorrectly states a term agreed upon ..."

Thus, the two Statutes of Fraud differ in as much as the Uniform Commercial Code does not require that all of the essential terms of the contract be in writing.

■ The Court of Appeals of the State of New York has recently recognized that a specialized Statute of Frauds prevails over a general one. *Henry L. Fox Co. v. William Kaufman Organization, Ltd.*, 74 N.Y.2d 136, 544 N.Y.S.2d 565, 542 N.E.2d 1082 (1989) (Statute of Frauds contained in the Insurance Law prevails over general Statute of Frauds, GOL § 5–701). In *Fox Co.*, moreover, the Court of Appeals specifically addressed the relationship between the Uniform Commercial Code Statute of Frauds and the general Statute of Frauds contained in GOL § 5–701, finding that under the more permissive standards of the Uniform Commercial Code Statute of Frauds, the essential terms of the agreement, including price, need not all be specified, unlike under GOL § 5–701. "It is sufficient that the writing affords a basis for believing the offered oral evidence rests on a real transaction." *Fox Co.*, 544 N.Y.S.2d at 568, 542 N.E.2d at 1085 (citing Uniform Commercial Code § 2–201, comment 1).

The Appellate Division, following *Fox Co.*, has held that the Uniform Commercial Code Statute of Frauds, and not GOL § 5–701, applies to contracts for the sale of goods. *AP Propane, Inc. v. Sperbeck*, 157 A.D.2d 27, 29, 555 N.Y.S.2d 211 (3d Dep't 1990) (applying Uniform Commercial Code § 2–201 to requirements contract for the sale of propane gas). Paper Corporation, however, points to no New York cases that stand for the proposition that the parties' rights in the aftermath of a unilateral termination of a distributor relationship are determined under the Statute of Frauds set forth in the Uniform Commercial Code rather than under GOL § 5–701. Indeed, a

recent Appellate Division case applied GOL § 5–701 to a breach of contract action arising out of defendant's unilateral termination of the plaintiff as its sales representative and exclusive distributor. *Zimmer–Masiello, Inc. v. Zimmer, Inc.*, 159 A.D.2d 363, 552 N.Y.S.2d 935 (1st Dep't 1990).

In *Zimmer*, plaintiff was the exclusive distributor and sales representative of defendant's surgical products. After purchasing these products from defendant, plaintiff resold them to doctors and hospitals. The action arose out of defendant's unilateral termination of the distributorship agreement, an agreement partly oral and partly in writing, and defendant's subsequent direct sales of its products to plaintiff's former customers. The court applied GOL § 5–701 to the breach of contract claim.

Here, the evidence shows that Paper Corporation's relationship with Schoeller was more akin to that of a distributor or sales agent than to that of a straight purchaser of goods. As stated above, Paper Corporation only placed orders with Schoeller for specific quantities of paper at specific prices for which Hallmark had already submitted a purchase order to Paper Corporation. The documents submitted by Paper Corporation as evidence for the purposes of satisfying the Statute of Frauds, moreover, refer to Schoeller's "shipments to Hallmark" and a "commitment to supply Hallmark." Schoeller's Letters to Fitzgerald of August 24, 1987 and of August 18, 1988 (Paper Corporation's Exhibits 2 and 8 to Scher Affidavit, respectively).

Even assuming Paper Corporation took title to the goods pending the resale to Hallmark, the risk that Paper Corporation would not be able to resell its purchases from Schoeller was small, as Paper Corporation based its orders on Hallmark's projected needs; indeed, Paper Corporation made no other orders on behalf of Hallmark other than those for which Hallmark had already submitted purchase orders. Paper Corporation was further compensated for assuming this risk in the form of the mark up on the paper it sold to Hallmark over the price at which it purchased the paper from Schoeller. In addition, at the time of the alleged breach, Paper Corporation had not remitted to Schoeller any consideration for Schoeller's commitment to supply its products. These facts all support a finding that the alleged breach related not so much to any commitment of Schoeller to supply Paper Corporation with its products as to Schoeller's failure to supply the materials through Paper Corporation, and therefore the conclusion that the Uniform Commercial Code's Statute of Frauds relating to the sale of goods does not apply to the instant case.

Moreover, in addition to the purchase of Schoeller's products, Paper Corporation provided a substantial amount of services consistent with its function as a sales representative. Paper Corporation worked with Hallmark to define the quantity and timing of its requirements, communicated what it learned to Schoeller so that Schoeller could plan its production, assisted with quality or delivery problems, acted as an intermediary for communications between Hallmark and Schoeller, and renegotiated quality and pricing terms with Hallmark at Schoeller's request. Indeed, the Amended Complaint alleges that Paper Corporation's relationship with Schoeller was that of distributor and sales representative. Amended Complaint ¶¶ 11, 12.

Paper Corporation points to no cases since *Fox, Co.* in which a New York court has held that GOL § 5–701 does not apply to a distributorship agreement. In *United Beer Distributing Co. v. Hiram Walker (N.Y.), Inc.*, 163 A.D.2d 79, 557 N.Y.S.2d 336 (1st Dep't 1990), cited by Paper Corporation for the proposition that New York courts have applied the Uniform Commercial Code to a distribution agreement, the court applied both Statutes of Fraud, GOL § 5–701 and the Uniform Commercial Code, to the alleged agreement. The court found that as the only evidence for the alleged agreement was oral, it failed to qualify under either Statute of Frauds. The court therefore did not address directly the question of which Statute of Frauds should apply.

Paper Corporation cites *North American Leisure Corp. v. A & B Duplicators, Ltd.,* 468 F.2d 695, 697 (2d Cir.1972) for the proposition that in a mixed goods and services contract, the predominance of goods or services determines the applicability of the Uniform Commercial Code. Applying New York law, the Court of Appeals for the Second Circuit in *North American Leisure* held that services predominated in the relationship between debtor and creditor, where the creditor's role pursuant to the agreement was to make copies of tapes from an original provided by debtor in preparation for public distribution and sale.

*North American Leisure,* however, considered the distinction between a contract for goods and a contract for services only in the course of determining which type of lien the creditor could enforce. *North American Leisure* therefore did not address the distinction between a contract for goods and a contract for services for the purposes of deciding which Statute of Frauds to apply. Moreover, Paper Corporation provided many services to Schoeller pursuant to their relationship, as set forth above, and Paper Corporation has failed to point to any case involving a distribution agreement similar to the one in the instant case in which a court applying New York law has held such agreement to be one for goods rather than for services. Therefore, under New York law, the Statute of Frauds applicable to the facts in this case is that contained in GOL § 5–701.

**B. The Sufficiency of the Terms of the Agreement under GOL § 5–701**

■ *Schoeller I* sets forth some of the essential terms to be set forth in the proffered writings in order for the alleged agreements to be enforceable under New York law. Among those essential terms are price, duration and volume or quantity. *Schoeller I,* 724 F.Supp. at 117. With respect to the breach of contract claim based on the alleged Hallmark agreement, *Schoeller I* held that:

> ... whether these documents constitute a signed writing sufficient to satisfy the Statute of Frauds ... is a much closer question—too close for a court to resolve

as a matter of law on a motion to dismiss, which requires a court to draw all inferences in favor of the nonmoving party. Taken together, Schoeller's letter could be interpreted at least as a commitment to supply Hallmark—through Paper Corporation exclusively—greeting card paper amounting to 4,00 tons in 1988, 6,000 tons in 1989, and 5,000 tons in 1990, 1991, and 1992, respectively.

**1. *Price***

In opposing the motion for summary judgment, Paper Corporation submits several letters and memoranda exchanged between Schoeller and Paper Corporation and between Paper Corporation and Hallmark in support of its position that there is at the very least, an issue of fact as to the existence an agreement as to the essential terms of the alleged contract. In a letter from Woods of Hallmark to Fitzgerald of Paper Corporation dated March 14, 1988, Hallmark confirmed its agreement to increase prices at stated intervals through February 1, 1989, and thereafter to allow prices to fluctuate with pulp pricing. A letter of June 29, 1988 from King of Schoeller to Fitzgerald and its accompanying memorandum sets forth price increases that Paper Corporation would pay Schoeller, based upon the Hallmark prices, through April, 1989. A letter of January 9, 1989 to Fitzgerald from King set forth a price formula tied to the price of paper pulp for "Paper Corporation of the United States" to be "effective on all orders shipped after February 1, 1989."

Based on the above, Paper Corporation has established evidence from which a jury might reasonably infer the existence of an agreement as to price, and has therefore raised an issue of fact as to this term. To the extent that the price is left open after 1989, the formula worked out in 1988 and set forth in the March 14 letter can be used to calculate the prices based on the fluctuating price of pulp.

**2. *Quantity and Duration***

A letter of August 18, 1988 from Kempner to Fitzgerald stated:

Quantities guaranteed to Hallmark are as follows:

| | |
|---|---|
| <u>1988</u> | 4,000 metric tons |
| <u>1989</u> | 6,000 metric tons |
| <u>1990</u> | |
| <u>& Beyond</u> | 5,000 metric tons/year |

The August 18 letter similarly provides evidence of duration and quantity from which a reasonable jury could infer an agreement as to those terms. Therefore, as Paper Corporation has set forth some evidence of agreement as to price, duration and quantity, it has met its burden under the summary judgment standard of showing that the question of whether the alleged agreement complies with the Statute of Frauds is a material issue of fact about which there is a genuine dispute.[1]

### 3. *GOL § 5–1109 is Inapplicable*

■ Schoeller cites GOL § 5–1109 for the proposition that the question of whether the agreement complies with the Statute of Frauds nonetheless does not rise to the level of a material dispute of fact because Paper Corporation's breach of contract claim is still not enforceable under either of the Statutes.

GOL § 5–1109 provides:

> Except as otherwise provided in Section 2–205 of the uniform commercial code with respect to an offer by a merchant to buy or sell goods, when an offer to enter into a contract is made in a writing signed by the offeror, or by his agent, which states that the offer is irrevocable during a period set forth or until a time fixed, the offer shall not be revocable during such period or until such time because of the absence of consideration for the assurance of irrevocability. When such a writing states that the offer is irrevocable but does not state any period or time of irrevocability, it shall be construed to state that the offer is irrevocable for a reasonable time.

In its statement pursuant to Local Rule 3(g), Paper Corporation contends that while Schoeller was required to supply specific quantities of paper to Hallmark, neither Hallmark nor Paper Corporation had a reciprocal obligation to buy all or even any of it, and therefore, even if there was an agreement, it was revocable.

In support of its argument that the agreement, even if it existed, was unenforceable as a matter of law, Schoeller cites *Capalongo v. Desch,* 81 A.D.2d 689, 438 N.Y.S.2d 638 (3d Dep't 1981), for the proposition that under § 5–1109, an offer may be revoked at any time in the absence of consideration if the offer does not state that it is irrevocable or that it must be accepted within a specified time. In *Capalongo,* the court applied § 5–1109 to an option agreement for which there was no consideration and reversed Special Term's determination that under the statute no consideration was necessary. In interpreting § 5–1109, the court stated that:

> The proper interpretation of this statute is that lack of consideration does not affect revocability, provided the writing contains reference either to a specific period of time, or simply states that it is irrevocable, in which event the irrevocability is construed to be a reasonable period of time.

Granted, Kempner's August 18, 1988 letter to Schoeller—in which Schoeller set forth its commitment to supply Hallmark with greeting card paper in the quantities specified—contains no language stating that such commitment is irrevocable or that it must be accepted within a certain time. Moreover, it is undisputed that as of the time of the January 6, 1989 meeting—at which Schoeller and Hallmark confirmed their agreement to deal directly with each other—Paper Corporation had given no consideration in exchange for the commitment set forth in the August 18 letter. However, as stated above, the letter of

---

**1.** Nor does the evidence set forth by Schoeller showing that Schoeller understood the quantities that were the subject of the correspondence to be in metric tons, rather than in short tons, as Fitzgerald of Paper Corporation understood the alleged agreement, support Schoeller's contention that there was no agreement as to quantity. The references to two differing measurements of quantity signifies rather the existence of a factual dispute as to the terms of the alleged contract than a complete lack of agreement.

August 18, 1988, in which King lists the quantities Schoeller intends to offer over the next several years, establishes evidence of the existence of a specified duration for the agreement. Indeed, the agreement cannot be said to be of indefinite duration where the quantities are not offered on an open-ended basis but are linked to a specific year. Thus, GOL § 5–1109 does not render the contract unenforceable as a matter of law.

Applying § 2–205 of the Uniform Commercial Code, to which GOL § 5–1109 refers and which Schoeller also cites, does not result in a different outcome. Section 2–205 of the Uniform Commercial Code provides:

> An offer by a merchant to buy or sell goods in a signed writing which by its terms gives assurance that it will be held open is not revocable, for lack of consideration, during the time stated or if no time is stated for a reasonable time, but in no event may such period of irrevocability exceed three months; but any such term of assurance on a form supplied by the offeree must be separately signed by the offeror.

As stated above, the alleged agreement between Schoeller and Paper Corporation involved a distributorship relationship pursuant to which Paper Corporation undertook to perform a substantial amount of services. Therefore, § 2–205, which covers only offers for goods, is inapplicable on its face. Moreover, even if § 2–205 did apply, the letter of January 9, 1989 arguably extends the offer, therefore placing the alleged breach within the three month period of the latest offer.

For all the reasons set forth above, Paper Corporation has set forth evidence showing a dispute of fact as to the existence of agreement on the terms of the alleged contract. For the reasons stated above, whether the parties agreed on the terms of the contract is a material dispute, as its outcome determines whether the alleged agreement falls within the Statute of Frauds, thereby precluding summary judgment on these grounds.

### III. *The Quantum Meruit Claim*

Under New York law, the existence of a valid and enforceable written contract ordinarily precludes recovery in *quantum meruit* for events arising out of the same subject matter. *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190, 193 (1987). However, a contract that is unenforceable under the Statute of Frauds may give rise to such a recovery on the basis of an implied contract. *L. Fatato, Inc. v. Miller Brewing Co.*, 582 F.Supp. 1377, 1379 (E.D.N.Y.1984) (citing Calamari & Perillo *Law of Contracts* § 19–40 (1977)). Therefore, even if the alleged contract is unenforceable under the Statute of Frauds, Paper Corporation is not as a matter of law precluded from recovery on the grounds of *quantum meruit.*[2]

In order to make out a claim in *quantum meruit*, the plaintiff must establish performance of his services in good faith, acceptance of the services by the persons to whom such services were rendered, expectation of compensation, and

---

**2.** Nor does GOL § 5–701(a)(10) preclude Paper Corporation's *quantum meruit* claim. That provision requires an agreement to pay services in compensation for services rendered in "negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing any real estate or interest therein, or of a business opportunity, business, its good will, inventory, fixtures or an interest therein...." and states that "[n]egotiating' includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction." GOL § 5–701(a)(10).

However, GOL § 5–701(a)(10) is not applicable here, where the alleged agreement that is the basis for the *quantum meruit* claim does not arise from a promise to pay a commission, but rather from an alleged commitment to supply a specified quantity of paper. Thus, *Seven Star Shoe Co. v. Strictly Goodies, Inc.,* in which this court held that plaintiff's claim for unjust enrichment was barred by GOL § 5–701(a)(10) is distinguishable from the instant case, where in *Seven Star Shoe* the plaintiff based its *quantum meruit* claim on defendant's alleged promise to pay plaintiff $1.00 for every units of defendants product that was sold, in consideration of plaintiff's supplying advice on sources of supply and marketing.

the reasonable value of such services. *Martin H. Bauman Assocs., Inc. v. H & M Int'l Transport.*, 567 N.Y.S.2d 404, 404 (1st Dep't 1991). The existence of such an implied contract is a question of fact. *Fatato*, 582 F.Supp. at 1379 (issue of fact remains as to evidence of implied contract between beer manufacturer and distributor sufficient to preclude summary judgment on whether *quantum meruit* claim enforceable, failure to meet Statute of Frauds notwithstanding) (citing 22 N.Y.Jur.2d Contracts § 543 at 548).

■ Where, as here, Paper Corporation has set forth evidence of its performance with respect to the Hallmark, as well as of Schoeller's acceptance of such performance, in the form of correspondence and deposition testimony, and where Paper Corporation has established, through evidence setting forth the mark up that Paper Corporation Customarily received on the sale of Schoeller products, its reasonable expectation of compensation as well as the reasonable value of such compensation, Paper Corporation has made a showing of the existence of an implied agreement sufficient to constitute a question of fact for the jury. Therefore, Schoeller's summary judgment motion is denied with respect to the *quantum meruit* claim.

*Conclusion*

For the reasons set forth above, Schoeller's summary judgment motion is denied both with respect to the breach of contract claim and with respect to the *quantum meruit* claim.

It is so ordered.