UNITED STATES SURGICAL
CORPORATION, Plaintiff,

v.

OREGON MEDICAL & SURGICAL SPECIALTIES, INC., et al., Defendants,
Third-Party Plaintiffs,

v.

Leon G. HIRSCH, Turi Josefsen and
Surgical Service Corporation,
Third-Party Defendants.

Nos. 77 Civ. 3693, 78 Civ. 5019, 79 Civ. 2939, 79 Civ. 5016, 79 Civ. 5130, 79 Civ. 5147 and 79 Civ. 5609.

United States District Court,
S. D. New York.

March 11, 1980.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiff United States Surgical Corp. by Jay Greenfield, New York City, of counsel.

Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, Minn., for defendants Kahn, d/b/a Advanced Surgical Methods, Allan J. Lamovec, Minnesota Surgical Specialties, Inc., Jerome Miller, d/b/a J. M. Surgical Specialties, and William E. Powers, Sr., d/b/a Powers Surgical Specialties by Jeffrey Keyes, Minneapolis, Minn., of counsel.

## MEMORANDUM AND ORDER

OWEN, District Judge.

Plaintiff United States Surgical Corporation ("U. S. Surgical" or the "Company") originally brought this suit against certain of its dealers, including Messrs. Lamovec, Miller, Powers, and Kahn (the "Minnesota dealers"), whose dealerships it intended to eliminate on or about February 25, 1980. The Company sought a declaratory judgment to the effect that its adoption of a new marketing strategy, whereby it replaced its existing network of independent dealerships with company salesmen, does not violate the antitrust laws.[1] The Minnesota dealers commenced an action in Minnesota state court alleging that the proposed terminations of their dealerships by U. S. Surgical violated the Minnesota Franchise Act, M.S.A. § 80C.01, et seq. (the "Franchise Act" or the "Act"). That lawsuit was removed by U. S. Surgical to the United States District Court in Minnesota. Subsequently, the Minnesota lawsuit was trans-

---

1. On August 23, 1979, U. S. Surgical sent each of the Minnesota dealers a letter stating that the Company had decided to discontinue its present reliance on independent dealerships. At the same time, defendants Lamovec, Miller, and Powers were offered positions as company salesmen.

ferred to the Southern District of New York and consolidated with U. S. Surgical's declaratory judgment action.

On January 17, 1980, the Minnesota dealers filed a motion for a preliminary injunction to stay U. S. Surgical's termination of their dealerships on February 25, 1980 and to enjoin the Company from competing with the defendants in Wisconsin, North Dakota, South Dakota, and Minnesota. In the alternative, they moved for summary judgment with respect to their claims under the Minnesota Franchise Act. U. S. Surgical opposed the foregoing and cross-moved for summary judgment in its favor with respect to the defendants' claims under the Franchise Act. For the reasons set forth below, U. S. Surgical's motion for summary judgment is granted, and the Minnesota dealers' motion for a preliminary injunction and/or summary judgment is denied.[2]

The parties disagree as to the applicability of the Minnesota Franchise Act, and the regulations promulgated thereunder, to U. S. Surgical's business activities in Minnesota.[3] The Franchise Act "was adopted in 1973 as remedial legislation designed to protect potential franchisees within Minnesota from unfair contracts and other prevalent and prevailing unregulated abuses. . ." *Martin Investors, Inc. v. Vander Bie*, 269 N.W.2d 868 (Minn.1978). The Act regulates the offer or sale of a franchise in Minnesota Minn.Stat. § 80C.01, subds. 15, 16; § 80C.19,

subds. 1–4, by requiring *inter alia*, registration by the franchisor of a proposed offering statement, Minn.Stat. § 80C.04, and full disclosure to the prospective franchisee of the terms of the franchise, Minn.Stat. § 80C.06. In addition, the Act prohibits "any unfair and inequitable practice," Minn.Stat. § 80C.14, which the regulations define to include the termination or cancellation of a franchise except for good cause, Minn.Reg. SDiv. 1714(e), (f).

The regulations also permit a franchisor to decline to renew a franchise after giving the franchisee both 90 days notice and an opportunity to recover his investment, Minn.Reg. SDiv. 1714(m). U. S. Surgical contends that (1) the U. S. Surgical Dealership Agreement (the "Agreement") did not grant the Minnesota dealers a "franchise" within the meaning of the Act; (2) even if a U. S. Surgical dealership is a "franchise," the Company never "offered or sold" a franchise in Minnesota; (3) even if the Act applies to the Company, the regulations promulgated in 1975 cannot be retroactively applied to dealership agreements that were executed prior to the effective date of the regulations; and (4) even if the 1975 regulations are applicable to the termination at issue, the Company insists that it has not violated the Act as a result of its decision to discontinue its present reliance on independent dealers.[4]

---

**2.** The dismissal of the Minnesota defendants' counterclaims under the Minnesota Franchise Act does not affect their counterclaims under the antitrust laws which are scheduled for consolidated trial on May 5, 1980.

**3.** In January 1975, the Attorney General of Minnesota promulgated "Rules and Regulations Relating to Franchises, Minnesota Statute Chapter 80C" (the "Regulations") which have the force of law as of the date of their publication. *Mason v. Farmers Ins. Co.*, 281 N.W.2d 344 (Minn.1979).

**4.** The Minnesota Franchise Act defines a "franchise" as follows:

Subd. 4. "Franchise" means a contract or agreement, either express or implied, whether oral or written, for a definite or indefinite period, between two or more persons: (a) by which a franchisee is granted the right to engage in the business of offering or distributing goods or services using the franchisor's

trade name, trademark, service mark, logotype, advertising, or other commercial symbol or related characteristics;

(b) in which the franchisor and franchisee have a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise; and

(c) for which the franchisee pays, directly or indirectly, a franchise fee

"Franchise" shall include a contract, lease, or other agreement whereby the franchisee is granted the right to market (1) automobiles, motorcycles, trucks, truck tractors, or self propelled motor homes or campers if the foregoing are designed primarily for the transportation of persons or property on the public highways or (2) motor vehicle fuel. Minn.Stat. § 80C.01. In addition, a "franchise fee" is defined by the Act as follows:

Subd. 9. "Franchise fee" means any fee or charge that a franchisee or subfranchisor is required to pay or agrees to pay for the right

The court need not reach the issues pertaining to the Franchise Act's applicability to U. S. Surgical in this case. Assuming *arguendo* that the Act governs U. S. Surgical's conduct, on the basis of the court's interpretation of the agreements between the Company and the Minnesota dealers, the proposed terminations of the defendants' dealerships will not, in my view, result in a violation of the Act.[5]

██ The Minnesota dealers argue that, by operation of the Franchise Act and Regulation 1714(e) and (f), the provisions of the U. S. Surgical Dealership Agreements permitting termination without cause are unenforceable. Consequently, the defendants conclude that the Dealership Agreements grant these dealers a U. S. Surgical "franchise" in perpetuity terminable only upon "good cause" as that term is defined by the Franchise Act. However, even assuming that the enactment of the Minnesota Franchise Act nullified the termination provisions of the agreements, the defendants are not thereby granted a U. S. Surgical dealership in perpetuity.[6] Under established principles of contract law,

> to enter into a business or to continue a business under a franchise agreement, including, but not limited to, the payment either in lump sum or by installments of an initial capital investment fee, any fee or charges based upon a percentage of gross or net sales, whether or not referred to as royalty fees, any payment for goods or services, or any training fees or training school fees or charges; provided, however, that the following shall not be considered the payment of a franchise fee:
> (a) The purchase of goods or agreement to purchase goods at a bona fide wholesale price;
> (b) The purchase of goods or agreement to purchase goods on consignment if the proceeds remitted by the franchisee from any such sale shall reflect only the bona fide wholesale price of such goods;
> (c) The repayment by the franchisee of a bona fide loan made to the franchisee from the franchisor;
> (d) The purchase of goods or agreement to purchase goods at a bona fide retail price subject to a bona fide commission or compensation plan that in substance reflects only a bona fide wholesale transaction;

courts are loathe to find that the absence of a terminal point indicates an intention to contract for the indefinite future, and a perpetual obligation will not usually be inferred from the absence of a terminating date . . .. If the parties intend that the obligation be perpetual they must expressly say so.

*Warner-Lambert Pharmaceutical Co. v. John J. Reynolds, Inc.*, 178 F.Supp. 655, 661 (S.D.N.Y.1959), *affirmed on the opinion below*, 280 F.2d 197 (2d Cir. 1960); *Boyle v. Readers' Subscription Inc.*, 481 F.Supp. 156 (S.D.N.Y.1979). Here, as evidenced by paragraph 17C of the Agreements, which provide for terminations without cause, there is no question that the parties did not intend to create a contract for a perpetual term. In the absence of any controlling contract provision fixing the duration of a contract, the law will deem the contract to be terminable within a "reasonable" period of time. *See Warner-Lambert Pharmaceutical Co. v. John J. Reynolds, Inc., supra* ; *Boyle v. Readers' Subscription Inc., supra. See generally McGinnis Piano and Organ Co. v. Yamaha International Corp.*, 480 F.2d 474 (8th Cir. 1973); 10 N.Y.Jur. *Contracts* § 412 (1960 & Supp. 1978). Thus, for the

> (e) The purchase, at their fair market value, of supplies or fixtures or agreement to so purchase supplies or fixtures necessary to enter into the business or to continue the business under the franchising agreement;
> (f) The purchase or lease, at the fair market value, of real property or agreement to so purchase or lease real property necessary to enter into the business or to continue the business under the franchise agreement.
> Minn.Stat. § 80C.01.

**5.** Each of the defendants signed identical form contracts entitled, "U. S. Surgical Dealership Agreement." Lamovec entered into his first dealership agreement in 1973. Lamovec's most recent agreement, signed by him on November 1, 1978 as President of Minnesota Surgical Specialties, Inc., was simply a continuation in corporate form of his original dealership. Kahn's dealership agreement was signed on April 1, 1975. Miller's contract was signed on October 13, 1974. The dealership agreement with Powers was executed on October 5, 1974.

**6.** Paragraph 20 of the U. S. Surgical Dealership Agreements provides that the Agreements should "be construed and enforced in accordance with the laws of the State of New York."

purposes of these motions, the Agreements between U. S. Surgical and the Minnesota dealers will be construed so as to be terminable within a "reasonable" time.

In fixing a "reasonable" contract term, the court will be guided by "the actual though unexpressed intention of the parties . . . ." *Warner-Lambert Pharmaceutical Co. v. John J. Reynolds, Inc., supra.* Each of the Minnesota dealers entered into their U. S. Surgical Dealership Agreements between 1973 and 1975. *See* note 5 *supra.* On or about February 25, 1980, the proposed termination date of the defendants' U. S. Surgical Dealerships, these contracts will have been in effect for five to seven years. The question presented, therefore, is whether the defendants' dealership agreements have terminated at the end of a reasonable term. An examination of the Agreements suggests that a four to five year term would be reasonable. For example, paragraph 17C of the Agreement, governing the notice required upon the termination of the dealership, provides as follows:

> 17. This Agreement may be terminated as follows:
>
> C. By either party, for any other cause, or without cause, as follows:
>
> During the first six months of dealership, upon fifteen days prior written notice; during the next six months of dealership, upon thirty days prior written notice; during the second, third and fourth years of dealership, respectively, upon sixty, ninety and one hundred twenty days prior written notice, respectively; and after the expiration of the fourth year of dealership, upon six months prior written notice.

This provision refers only to the second, third and fourth years of the dealership. It is consistent with the express language of the contracts to conclude that terms of five to seven years are reasonable. Thus, I find that the proposed February 25, 1980 terminations by U. S. Surgical occurred at a point when the contracts had been in existence for a reasonable period of time.

The Minnesota Franchise Act permits the termination or non-renewal of a franchise agreement when the contract has expired. The Franchise Act clearly contemplates that franchises may have fixed terms, and may come to an end at the conclusion of such a term. The Franchise Act regulations provide that:

> [I]t shall be 'unfair and inequitable' for any person to:
>
> (m) Fail to renew a franchise unless the franchisee has been given written notice of the intention not to renew at least 90 days in advance thereof and has been given a sufficient opportunity to recover his investment or unless for good cause as defined in clause (f).

Minn.Reg. SDiv. 1714(m). Therefore, at the end of the contract term, the franchisor may simply fail or refuse to renew a franchise as long as the franchisee is given the required notice and an opportunity to recoup his investment. In sharp contrast to the "good cause" required to terminate a franchise during the term of the franchise agreement, Minn.Reg. SDiv. 1714(e), (f), non-renewal or termination without cause incident to the end of the contract term are sanctioned by the Minnesota Franchise Act and the regulations promulgated thereunder.[7] There appears to be no dispute over the fact that, as required by Minn.Reg. SDiv. 1714(m), the Minnesota dealers have been given the requisite notice of termination and are being given a sufficient opportunity to recoup their investments. Given the fact that U. S. Surgical has complied with the terms of the Act, the court need not decide the question of the applicability of the Minnesota Franchise Act to the U. S. Surgical dealerships. Accordingly, U. S. Surgical's motion for summary judgment with respect to the alleged violations of the Minnesota Franchise Act is granted, and the Minnesota dealers' motion for a prelimi-

---

7. The court need not reach the arguably difficult questions of whether the U. S. Surgical minimum inventory requirement and/or the collection fee constitute a "franchise fee" as that term is defined in the Act.

nary injunction and/or summary judgment is denied.

So ordered.