**PAPER CORPORATION OF THE UNITED STATES, Plaintiff,**

v.

**SCHOELLER TECHNICAL PAPERS, INC., Defendant.**

**No. 89 Civ. 2504 (RWS).**

United States District Court, S.D. New York.

Nov. 25, 1992.

---

Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA (Howard D. Scher, Stephen D. Ellis, of counsel), for plaintiff.

Walter, Conston, Alexander & Green, P.C., New York City (Alan Kanzer, Howard A. Bender, of counsel), for defendant.

## OPINION

SWEET, District Judge.

This action between Plaintiff Paper Corporation of the United States ("Paper Corporation") and Defendant Schoeller Technical Papers, Inc. ("Schoeller") was tried before a jury from July 8 to 16, 1992. On July 16 the jury returned a verdict for Paper Corporation, awarding it $1,114,002 in damages and interest.

Schoeller has now moved pursuant to Rule 50, Fed.R.Civ.P. for a judgment as a matter of law or, in the alternative, for a new trial pursuant to Rule 59, Fed.R.Civ.P. For the reasons set forth below, this motion is denied.

### Prior Proceedings

This motion comes at the end of a series of proceedings that culminated in the aforementioned seven-day jury trial. In four previous opinions, familiarity with which is assumed, the Court has described the par-

ties and their respective business and discussed their relationship with each other in the paper business, which extends back to 1964, and the history of the relevant market conditions precipitating this action. *See Paper Corp. of United States v. Schoeller Technical Papers, Inc.*, 773 F.Supp. 632, 633–35 (S.D.N.Y.1991) (*"Schoeller IV"*); *Paper Corp. of United States v. Schoeller Technical Papers, Inc.*, 759 F.Supp. 1039, 1041–43 (S.D.N.Y.1991) (*"Schoeller III"*); *Paper Corp. of United States v. Schoeller Technical Papers, Inc.*, 742 F.Supp. 808, 809 (S.D.N.Y.1990) (*"Schoeller II"*); *Paper Corp. of United States v. Schoeller Technical Papers, Inc.*, 724 F.Supp. 110, 111–14 (S.D.N.Y.1989) (*"Schoeller I"*).

On July 31, 1992, Schoeller filed the present motion. Oral argument was heard and the Court considered the motion fully submitted on August 26, 1992.

### Discussion

**I. Schoeller is Not Entitled to a Judgment as a Matter of Law**

The standard pursuant to which Schoeller's motion for a judgment as matter of law must be decided is set forth in Rule 50(a)(1), Fed.R.Civ.P.:

> If during a trial by jury a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law against that party on any claim ... that cannot under the controlling law be maintained without a favorable finding on that issue.

Rule 50(b) provides that when a Rule 50(a)(1) motion is denied, "the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion."

A judgment as a matter of law should be entered on behalf of a party when

> the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion

as to the verdict that reasonable men could have reached. Put differently, for judgment n.o.v. to be granted, there must be such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or ... such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.

*Song v. Ives Lab., Inc.*, 957 F.2d 1041, 1046 (2d Cir.1992) (citations and internal quotations omitted).[1]  *Accord County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1311 (2d Cir.1990); *Baskin v. Hawley*, 807 F.2d 1120, 1129 (2d Cir.1986).

■ In deciding a Rule 50 motion, the evidence must be considered in the light most favorable to the nonmovants. *See Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 573 (2d Cir.), *cert. denied*, 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 (1982); *Quintel Corp., N.V. v. Citibank, N.A.*, 606 F.Supp. 898, 905 (S.D.N.Y.1985). Furthermore,

[c]ourts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.

*Tennant v. Peoria & Pekin Union Ry. Co.*, 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944).

Therefore, Schoeller is entitled to a judgment as a matter of law only if it establishes that the unweighed evidence and testimony presented at the trial supports a single conclusion contrary to the verdict reached by the jury. In other words, Schoeller must show that no reasonable jury could have found in favor of Paper Corporation. But the jury's verdict must be affirmed if there is sufficient evidence to support the jury's reasonable findings of fact, even if a different conclusion is also possible. *See Quintel*, 606 F.Supp. at 907;

*Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 545 F.Supp. 1314, 1326 (S.D.N.Y. 1982).

A review of the record and Schoeller's proofs reveals that a reasonable jury could have reached a conclusion other than the one Schoeller now presses upon the Court as the only conclusion possible as a matter of law. The record supports the conclusion that a reasonable and fair-minded jury could have returned a verdict in favor of Paper Corporation as this jury did.

**A.  Proof of a Breach of Contract Claim**

■ The Court instructed the jury that, under New York law, to establish a claim for breach of contract, a plaintiff must prove (1) that an agreement existed between it and the defendant, (2) what the respective obligations of the parties were, (3) that the plaintiff performed its obligations under the agreement, (4) that the defendant breached the agreement by failing to perform its obligations, and (5) that the plaintiff suffered damages as a result of the breach. *See* Tr. 842; 2 *New York Pattern Jury Instructions—Civil* 4:1 Comment at 868. The Court then gave further instructions regarding each of these elements, and the jury's findings on each of these elements was not inconsistent with the trial record.

**B.  *The Existence of an Enforceable Agreement***

The first element that a plaintiff must establish to succeed on a breach of contract claim is that an enforceable contract existed between the parties. In order to be enforceable, an agreement must satisfy various well-known conditions required by New York contract law. The Court instructed the jury in some detail regarding each condition, and again, the findings of the jury on each condition and on the enforceability of the agreement were not inconsistent with the evidence presented.

---

**1.** Although Rule 50 was amended in 1991 to change the terms "directed verdict" and "judgment notwithstanding the verdict" to "judgment as a matter of law," the Advisory Committee

Notes and 5A J. Moore, *Moore's Federal Practice* ¶ 50.02 (2d ed. 1992), indicate that the change in terms was not intended to affect the legal standards to be applied pursuant to the Rule.

### 1. Meeting of the Minds

The Court instructed the jury on the law of New York regarding the formation of enforceable contracts as follows:

> to establish the agreement Paper Corporation must prove that Paper Corporation and Schoeller mutually agreed to the terms and conditions of the agreement. This is referred to as the meeting of the minds. There can be no agreement if only one party intends to be bound.
>
> Since intent, including intent to be bound, is not always susceptible to direct proof because it relates to a person's state of mind, the law presumes that a person intends the natural and probable results of one's acts. The meeting of the minds or the mutual manifestation of intent may be made wholly or partly by written or spoken words or by other acts or conduct, and an internal or unexpressed intention not to be bound is not effective.
>
> In making this determination as to whether there was an agreement between the parties, you must use an objective approach. Each part[y's] intent to enter into the alleged agreement must be determined by considering the relationship of the parties, including what they said and what they did, in all the surrounding circumstances. Moreover, the parties must have reached an agreement as to all of its essential terms. There must be an offer by one side which is accepted and agreed to by the other side. If they failed to agree on a single essential term, then you must find that the parties did not enter into an agreement.
>
> A term is essential to an agreement if it seriously affects the rights and obligations of the parties. Such terms include price, quantity, duration, and consideration.

Tr. 842–43. *See Schurr v. Austin Galleries of Illinois, Inc.*, 719 F.2d 571, 576 (2d Cir.1983); *Gennaro v. Rosenfield*, 600 F.Supp. 485, 489–90 (S.D.N.Y.1984); *John's Insulation, Inc. v. Siska Constr. Co.*, 671 F.Supp. 289, 293 (S.D.N.Y.1987); *Brown Bros. Electrical Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 393 N.Y.S.2d 350, 352, 361 N.E.2d 999, 1001 (1977).

### 2. Terms of the Agreement

With regard to the terms of the agreement, the Court charged the jury as follows:

> Paper Corporation contends that it and Schoeller are parties to an agreement pursuant to which Schoeller was to sell, Hallmark was to purchase exclusively through Paper Corporation, specified quantities of greeting card paper in each of the years 1988 through 2004, at prices determinable under a formula based in part upon the price Schoeller had to pay for pulp, . . . and in part on a 30 percent profit margin for Schoeller. Schoeller denies that it made such an agreement.
>
> If Paper Corporation has established that such an agreement existed, then, if Schoeller failed to perform its obligations under that agreement, you must return a verdict for Paper Corporation.

Tr. 845–46.

Despite the charge that the jury could find an agreement between Paper Corporation and Schoeller spanning the years from 1988 through 2004, the jury awarded Paper Corporation damages only through the end of 1992. This verdict suggests that the jury found either that the parties reached an agreement as to specific quantities only through 1992 or that the parties did, in fact, reach an agreement through 2004. A reasonable jury could have reached the latter conclusion and returned the verdict of this jury by following the charge and holding that the writings at issue did not sufficiently confirm commitments for specific quantities beyond 1992, and that the agreement was therefore terminable at will by Schoeller after, but not before, 1992.

In fact, when the Court first addressed this issue, in *Schoeller I*, in the course of deciding Schoeller's Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court acknowledged the possibility that a reasonable jury could find an enforceable agreement between the parties. At that point, the record consisted only of the pleadings and various documents Paper

Corporation had appended to its complaint, which were alleged to contain the agreement's essential terms. *See* 724 F.Supp. at 116. In denying that motion, the Court found that

> whether these documents constitute a signed writing sufficient to satisfy the Statute of Frauds regarding Hallmark is a much closer question—too close for a court to resolve as a matter of law on a motion to dismiss, which requires a court to draw all inferences in favor of the nonmoving party. Taken together, Schoeller's letters could be interpreted at least as a commitment to supply Hallmark—through Paper Corporation exclusively—greeting card paper amounting to 4,000 tons in 1988, 6,000 tons in 1989, and 5,000 tons in 1990, 1991, and 1992, respectively.

*Id.* at 117.

A review of the record regarding each of the essential terms of the agreement reveals that a reasonable jury could, in fact, arrive at the verdict this jury returned against Schoeller.

### a. *Quantity*

■ Schoeller contends that the jury could have drawn only a single conclusion from the evidence regarding quantity, namely, that no agreement between the parties was ever reached. Schoeller's claim relies on letters between Gerhard Kemper ("Kemper"), Schoeller's former president, and Bob Fitzgerald ("Fitzgerald"), Paper Corporation's former president. In his letter of August 18, 1988 to Fitzgerald, Kemper set forth the quantities of greeting card paper, measured in metric tons, with which Schoeller wanted to supply Hallmark between 1988 and 1992. In Fitzgerald's answering letter of August 23, 1988, he stated that the quantities he had discussed with Hallmark were in units of short tons rather than metric tons. In Schoeller's view, these letters reveal a material difference between the parties, regarding the measure of the quantities at issue—a short ton being 10% less than a metric ton, which was never resolved.

However, while Schoeller offered uncontested testimony regarding the monetary significance of the difference between short tons and metric tons amounts of greeting card paper, a reasonable jury could have found that an agreement regarding quantity was reached in favor of the short-ton measure, and that Kemper inaccurately described an incidental item when he stated the tonnages committed in metric tons rather than short tons. No fewer than five letters between Paper Corporation and Schoeller, written both before and after Kemper's August 18, 1988 letter, were entered into evidence that referred to the quantities of greeting card paper in short tons, not metric tons. Further, there is no evidence that, during the course of its dealings with Paper Corporation, Schoeller ever raised an objection to this difference in the two measures. It was only in its defense of this action that Schoeller asserted for the first time that the validity of the agreement hinges entirely on this difference in the measures of the quantities of greeting card paper Schoeller was to supply to Paper Corporation. But the fact remains, and it appears that the jury found it compelling, that Schoeller and Paper Corporation were able to perform according to the terms of the set forth in the letters entered in evidence notwithstanding what Schoeller asserted at trial to have been a critical failure to agree about a material term.

Finally, if, as the jury could have reasonably found, Schoeller was committing its entire output of greeting card paper to Paper Corporation to sell to Hallmark, a ten percent discrepancy between metric tons and short tons is not material as a matter of law, and the jury was entitled to conclude that the discrepancy was not a material difference. If Schoeller had wished to make more paper available to Hallmark than Paper Corporation had previously understood, that fact would not have permitted Schoeller to avoid its commitment to make its output available to Paper Corporation, regardless of what that output was projected to be.

### b. *Duration*

■ The Court charged the jury regarding the duration of the contract and its effect on the parties as follows:

If you find that an agreement between the parties exists, but that it had no time limit or was for an indefinite period, then you must find that the agreement was terminable at will. And an agreement terminable at will may be freely terminated by any party to the agreement.

Tr. 843–44. *See Arledge v. Stratmar Systems, Inc.*, 948 F.2d 845, 847–48 (2d Cir. 1991); *United States Surgical Corp. v. Oregon Medical & Surgical Specialties, Inc.*, 497 F.Supp. 68, 71 (S.D.N.Y.1980); *Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329, 333, 506 N.E.2d 919, 920, 514 N.Y.S.2d 209, 211 (1987).

Schoeller asserts that the term of duration of the agreement was never resolved between it and Paper Corporation, contending that Kemper's August 18, 1988 letter spoke of a five year commitment, while Fitzgerald testified that there was a firm deal only for 1988.

However, a reasonable jury could have found a term of duration that was agreed to by the parties from the correspondence between the parties, Schoeller's internal memoranda, Schoeller's explicit commitment to continue to sell specified quantities of greeting card paper at least through 1992, and Fitzgerald's testimony. Fitzgerald testified that his understanding of the agreement was that Paper Corporation was

> the exclusive sales distributor for Schoeller, that would continue as long as Schoeller made greeting card paper, that we would buy the product at the Schoeller list price, and that we would not offer in competition anything that would compete with Schoeller.

Tr. 177.

The testimony of Richard Gall, Schoeller's president from 1985 to May 1988, supported a jury determination that sales to Hallmark were to be effected solely through Paper Corporation, although he stated that there was no time limit on the parties' agreement. But in addition to Kemper's August 18, 1988 letter, other correspondence and Schoeller's internal memoranda were admitted into evidence that set forth the period of the agreement as running for at least five years from 1988 through 1992.

Therefore, even though there was no outside time limit to the agreement, a reasonable jury could have found there to be a minimum duration to Schoeller's commitment to sell Paper Corporation specific quantities in "1990 and beyond," Ex. PX–102, and through 1992, Ex. PX–111. A reasonable jury could have concluded as this jury did that the term of duration in the agreement between Schoeller and Paper Corporation was agreed to commence in 1988 and continue for at least five years through 1992.

#### c. *Price*

With regard to the term of price in the agreement, the Court instructed the jury concerning Paper Corporation's contention that:

> Schoeller was to sell ... specified quantities of greeting card paper in each of the years 1988 through 2004, at prices determinable under a formula based in part upon the price Schoeller had to pay for pulp, ... and in part on a 30 percent profit margin for Schoeller.

Tr. 845. On this instruction and from the evidence in the record, a reasonable jury could have found a sufficiently definite price term in the agreement to which the parties agreed.[2]

Schoeller alleges that there was no "meeting of the minds" regarding the price term of the agreement and cites Fitzgerald's testimony in support of this claim. Mr. Fitzgerald testified that Paper Corporation paid whatever price Schoeller charged for the greeting card paper so long

---

2. Under New York law,

> where at the time of the agreement the parties have manifested their intent to be bound, a price term may be sufficiently definite if the amount can be determined objectively without the need for new expressions by the parties; a method for reducing uncertainty to certainty might, for example, be found within

the agreement or ascertained by reference to an extrinsic event, commercial practice or trade usage.

*Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 483, 548 N.E.2d 203, 548 N.Y.S.2d 920 (1989), *cert. denied*, 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990).

as Paper Corporation could resell the paper to Hallmark, and that after the parties agreed on a price formula, Hallmark reserved the right to reduce its purchases of Schoeller paper if Hallmark unilaterally determined that Schoeller's price were out of line with that of other paper mills.

Schoeller's analysis of Fitzgerald's testimony does not, however, demonstrate that a reasonable jury could not find an enforceable price term here. The fact that Hallmark could have decided to reduce its volume of purchases of greeting card paper if it determined that Schoeller's price was too high does not refute the possibility of the existence of an agreement between Schoeller and Paper Corporation to continue selling Schoeller paper at prices determined under the agreed-upon formula. Additionally, the record is devoid of any evidence from which a reasonable jury could infer that Schoeller's price ever was too high, or that Hallmark would have stopped buying Schoeller paper through Paper Corporation at any time.

■ Finally, an agreement to determine price changes by reference to changes in the market price of pulp is valid and enforceable. *See Cobble Hill*, 74 N.Y.2d at 483, 548 N.Y.S.2d 920, 548 N.E.2d 203.

### 3. The Writings

■ Under New York law, once it has been established that the parties to a contract have agreed on the essential terms, courts are encouraged to exercise discretion as they interpret the contract in favor of enforcing the various promises made by the parties. Thus,

[w]hile there must be a manifestation of mutual assent to essential terms, parties also should be held to their promises and courts should not be "pedantic or meticulous" in interpreting contract expressions. (1 Corbin, *Contracts* § 95, at 396 [1963]; *see also* UCC 2–204[3].)[3] Before rejecting an agreement as indefinite, a court must be satisfied that the agreement cannot be rendered reasonably cer-

tain by reference to an extrinsic standard that makes its meaning clear (1 Williston, *Contracts* § 47, at 153–56 [3d ed. 1957]). The conclusion that a party's promise should be ignored is meaningless "is at best a last resort." (*Cohen & Sons v. Lurie Woolen Co.*, 232 N.Y. [112,] 114, 133 N.E. 370 [(1921)]).

*Cobble Hill*, 74 N.Y.2d at 483, 548 N.Y.S.2d 920, 548 N.E.2d 203.

The Court instructed the jury as to each element that an agreement must have to be enforceable and charged the jury regarding the Statute of Frauds as follows:

for an agreement to satisfy the requirements of the statute of frauds, each of the essential terms must also appear in documents signed and subscribed by Schoeller. The statute of frauds doesn't require that all of the terms be spelled out in a single document. Instead, the agreement may be pieced together out of separate writings. These separate writings may include correspondence and internal Schoeller memoranda, which, taken together, contain substantially the whole agreement and its material terms and conditions, so that a person reading the materials would understand what the agreement is. These writings must clearly refer to the same transaction and need not all be signed. But the documents which establish the understanding must be signed and subscribed. Custom and usage in the trade do not substitute for this requirement, though such custom and usage may be considered with respect to the intent of the parties and with respect to defining the terms.

Tr. 844–45. *See Schoeller I*, 724 F.Supp. at 116–17; 2 *New York Pattern Jury Instructions—Civil* 4:1 at 869–70.

■ Schoeller contends that no reasonable jury could find, on this record, that the Statute of Frauds was satisfied because there are no writings signed by Schoeller setting forth the specific quantities of greeting card paper to be sold to Hallmark or Paper Corporation for each year from

---

**3.** This is not a UCC case but rather involves an agreement for an option to purchase a nursing

home, which the court enforced.

1988 through 2004. Schoeller notes further that even its unsigned business plans do not project beyond 1994.

Schoeller identifies three signed writings that could be construed as covering the period of 1989 to 1992, and that contain references to specific quantities of greeting card paper to be supplied to Hallmark: (1) the internal memorandum of June 16, 1988 of Arlon King ("King"), Schoeller's chief greeting card salesman; (2) King's internal memorandum of July 14, 1988; and (3) Kemper's August 18, 1988 letter. Schoeller asserts that these documents taken separately or together fail to satisfy the Statute of Frauds because they do not contain the necessary material terms on which the parties agreed, and because no such resolution of terms was ever reached.

The jury's verdict suggests that it accepted Schoeller's argument with regard to an enforceable agreement after 1992. However, King's internal memorandum of July 14, 1988 confirmed guaranteed tonnages in "1990 and beyond," PX–102, which King testified meant through "the nineties," Tr. 296, and could have been interpreted by a reasonable jury to confirm a commitment to continue to sell through Paper Corporation for as long as Schoeller continued to make greeting card paper, which would be at least through 2000. In any case, Kemper's letter of August 18, 1988 explicitly stated "we would like to reiterate our commitment to supply Hallmark with greeting card paper" through 1992. Ex. PX–111. A reasonable jury could have concluded that these writings, along with the other correspondence and internal memoranda in evidence, satisfied the Statute of Frauds.

### 4. Reciprocal Obligations

■ With regard to the contractual element of consideration, the Court instructed the jury that,

"[c]onsideration" simply means that the agreement has imposed a mutuality of obligation upon the parties. A promise between two parties may constitute sufficient consideration. However, a promise must be binding to support another promise as consideration. Under the circumstances here, there must be corresponding duties: Schoeller to sell and Paper Corporation to buy. Promises will not support each other as consideration unless they impose a legal obligation on both parties. The mutual obligations, or promises, of the parties do not necessarily have to be expressly set forth in an agreement, but may be implied by the duty of good faith that is implied in any agreement. The boundaries of the duty of good faith are defined by the parties' intentions and reasonable expectations in entering into the agreement and preclude each party from engaging in conduct that will deprive the other of the benefits of their agreement.

Tr. 844. *See Leberman v. John Blair & Co.*, 880 F.2d 1555, 1560 (2d Cir.1989); *Filner v. Shapiro*, 633 F.2d 139, 143 (2d Cir. 1980); *Travellers Int'l AG v. Trans World Airlines, Inc.*, 722 F.Supp. 1087, 1104 (S.D.N.Y.1989); *Topken, Loring & Schwartz, Inc. v. Schwartz*, 249 N.Y. 206, 210, 163 N.E. 735 (1928); *Hamer v. Sidway*, 124 N.Y. 538, 545, 27 N.E. 256 (1891).

Schoeller claims that a reasonable jury could not have found such consideration or mutual obligations because there was neither testimony nor evidence of any agreement that Paper Corporation and Hallmark would buy and Schoeller would sell greeting card paper. This claim is mistaken.

The record allowed a reasonable jury to conclude that the agreement required Paper Corporation to sell Schoeller's paper to Hallmark. Hallmark's discretion regarding the volume of its purchases and the fact that Paper Corporation might not have been able to sell the paper if Schoeller's price were too high do not render the agreement void or voidable. *See Lee v. Joseph E. Seagram & Sons, Inc.*, 552 F.2d 447, 454 (2d Cir.1977) (a requirement that a defendant's performance be "acceptable" to the plaintiff does "not render the agreement illusory in the sense that it is not supported by consideration"; New York courts impose an obligation of good faith upon the plaintiff's exercise of that discretion).

Further, New York law does not require terms of a contract to be precisely and perfectly stated to be enforceable if the parties' intentions can be determined within a reasonable degree of certainty. *See Travellers Int'l*, 722 F.Supp. at 1102. The terms may be found in the writings "either expressly or by reasonable implication." *Lauter v. W & J Sloane, Inc.*, 417 F.Supp. 252, 258 (S.D.N.Y.1976). In determining the intention of the contracting parties, it is proper to consider matters outside the writings, including the previous dealings between the parties and the practices of the trade. *See Travellers Int'l*, 722 F.Supp. at 1102.

The failure of an agreement explicitly to require one party to promise to purchase from the party who has promised to sell does not render the agreement unenforceable. *See Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 574 n. 8 (2d Cir.1969); *Baker's Aid, Div. of M. Raubvogel Co. v. Hussman Foodservice Co.*, 730 F.Supp. 1209, 1219 (E.D.N.Y.1990). As Justice Cardozo noted in *Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 118 N.E. 214 (1917), "[a] promise may be lacking, yet the whole writing may be 'instinct with an obligation' imperfectly expressed." 222 N.Y. at 91 (citation omitted). "In such a case, a good faith agreement to purchase one's requirement is properly implied." *Baker's Aid*, 730 F.Supp. at 1219.

Finally, the parties' corresponding obligations do not need to be equal in nature. *See Strobe v. Netherland Co.*, 283 N.Y.S. 246, 252, 245 A.D. 573 (4th Dep't 1935) ("The law does not weigh the quantum of consideration.").

A reasonable jury could have found on this record that the writings evidenced Schoeller's intention and promise to sell the stated quantities to Paper Corporation and Paper Corporation's corresponding obligation, albeit an implied promise, to sell Schoeller's paper to Hallmark.

### C. Conclusion

Schoeller is not entitled to a judgment as a matter of law. A review of the record on which the jury reached its verdict reveals that the verdict was not "the result of sheer surmise and conjecture." *Song,* 957 F.2d at 1046. A reasonable jury could have reached the same verdict as reached by this jury on the evidence and testimony before it.

### II. Schoeller is Not Entitled to a New Trial

A new trial may be granted pursuant to Rule 59, Fed.R.Civ.P. when "the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice" and a judgment as a matter of law would not be appropriate. *Song,* 957 F.2d at 1047. *See Smith v. Lightning Bolt Prod., Inc.,* 861 F.2d 363, 370 (2d Cir.1988); *Quintel,* 606 F.Supp. at 906. "Unlike a judgment n.o.v., a new trial may be granted even if there is substantial evidence to support the jury's verdict." *Song,* 957 F.2d at 1047. *See Bevevino v. Saydjari,* 574 F.2d 676, 684–85 (2d Cir.1978). As this Court has previously noted, a "court has considerable discretion in ordering a new trial if the verdict is so inconsistent with the weight of the evidence or if the errors at trial were so prejudicial that to do otherwise would be a miscarriage of justice." *Quintel,* 606 F.Supp. at 906. *See also Haber v. County of Nassau,* 557 F.2d 322, 325 (2d Cir.1977) ("The trial judge has a large discretion in ordering a new trial, as distinguished from his power to enter judgment n.o.v.). Finally, in deciding a Rule 59 motion for a new trial, the court may weigh the evidence on the record and need not view it in light most favorable to the verdict winner. *See Fund of Funds,* 545 F.Supp. at 1326.

A review of the testimony and evidence at trial and Schoeller's proofs in support of its motion, however, reveals that the jury's verdict is within the realm of reasonableness and does not approach the threshold of being the sort of "seriously erroneous result" that would constitute a miscarriage of justice and necessitate a new trial. *Song,* 957 F.2d at 1047.

### A. The Jury Verdict was Not Contrary to the Weight of the Evidence

As was noted above, the Court initially visited this issue in *Schoeller I,* while decid-

ing Schoeller's motion to dismiss Paper Corporation's original complaint. In denying Schoeller's motion, the Court held that the writings supplied by Paper Corporation in support of its complaint, which were subsequently entered into evidence at trial, were sufficient to state a cause of action. 724 F.Supp. at 117. Thus, this Court may not and will not interpret that evidence in such a way as to now take the case back from the jury. Rather, Schoeller has the burden of proving that once before the jury, the evidence proffered was such that it supported only a verdict for Schoeller and the verdict actually rendered constituted a miscarriage of justice.

Schoeller bases its contention that the jury verdict was contrary to the weight of the evidence on its analysis of the testimony of Fitzgerald and Kemper. Schoeller contends that Fitzgerald's testimony was not credible because, on cross-examination, his recollection was poor, he contradicted himself, and his "interpretation" of the exhibits was "idiosyncratic". By contrast, Schoeller extols Kemper's testimony as a model of clarity and consistency, which far outweighs that of Fitzgerald.

However, when Fitzgerald's testimony is considered in the context of Schoeller's cross-examination and against a background of his direct testimony and the entire record, it is not possible to conclude that the jury verdict was contrary to the weight of the evidence. Paper Corporation's witnesses, Fitzgerald and Gall, were the only people to testify who had firsthand knowledge of the commitments made by Schoeller in 1987, and their testimony was such that a reasonable jury could find it to be consistent and credible. Schoeller's witnesses, on the other hand, lacked personal knowledge of the agreement and of the commitments made by Schoeller, and a reasonable jury could find that they did not challenge Paper Corporation's interpretation of Schoeller's writings.[4] Further, what Schoeller dismisses as Fitzgerald's idiosyncratic interpretation of the exhibits could have been found by a reasonable jury to be consistent with the parties' conduct and with common sense; and it was an interpretation generally confirmed by Mr. Gall.

## B. *The Court Did Not Err*

Schoeller alleges that it did not receive a fair trial because: (1) the issues to be tried were not established at the inception of the trial, as a result of which (2) Paper Corporation was permitted to introduce evidence that related to a dismissed claim, that was remote from the relevant time-period of 1987–88, and that was highly prejudicial to Schoeller; and (3) the Special Verdict Form was inconsistent with what the Court charged the jury regarding the essential elements of the agreement and permitted the jury to render a verdict in favor of Paper Corporation without requiring it first to determine that the parties entered into an enforceable bilateral agreement. On each of these issues, Schoeller is mistaken, and Schoeller's reliance on them cannot support its motion for a new trial.

### 1. The Issues to be Tried

Contrary to Schoeller's assertion, the issues at trial were fixed with adequate certainty. This action had proceeded through a rigorous pre-trial discovery process and series of motions. *See Schoeller I*, 724 F.Supp. at 110 (Schoeller's Rule 12(b)(6) motion for an order dismissing Paper Corporation's original complaint granted in part and denied in part); *Schoeller II*, 742 F.Supp. at 808 (Schoeller's Rule 12(b)(6)

**4.** Kemper's testimony regarding various documents was discussed *supra*. Schoeller also proffered testimony by Robert Bishop ("Bishop"), a manager in Schoeller's sales and marketing group until 1988, and Donald Schnackel ("Schnackel"), an accountant with Schoeller since 1987. Although Bishop had no personal knowledge of the formation of the agreement, he had made the recommendation to terminate the agreement after an investigation, which did not include any conversations with Gall or Michael Gallenkamp, Schoeller's chairman. A reasonable jury justifiably could have concluded from Bishop's testimony that he had no personal knowledge about the agreement at all.

Schnackel's testimony concerning the calculations of profit margins and Schoeller's marketing decisions could have been disregarded by a reasonable jury in light of the concession he made about the assumptions upon which his damages opinions were based.

motion for an order dismissing Paper Corporation's amended complaint granted in part and denied in part); *Schoeller III*, 759 F.Supp. at 1039 (Paper Corporation's Rule 15 motion to amend its complaint denied and Rule 37 motion to compel discovery granted in part and denied in part); *Schoeller IV*, 773 F.Supp. at 632 (Schoeller's Rule 56 motion for summary judgment denied). The Court set forth detailed discussions of the issues as they were narrowed through motion practice as the case advanced toward trial. From Paper Corporation's original complaint and the opinion in *Schoeller I*, denying Schoeller's motion to dismiss, through the jury instructions and the special interrogatory to the jury, Schoeller knew of Paper Corporation's claim.

Schoeller knew precisely what Paper Corporation claims were with regard to the breach of contract allegation, the very subject matter of the trial. This is sufficiently demonstrated by the fact that, in the Final Pretrial Order, Schoeller explicitly conceded the possibility that there could have been an enforceable agreement through 1992:

> Schoeller further contends that even if there were a writing signed and subscribed by Schoeller that evidenced a contractual commitment to sell greeting card paper to Paper Corporation for Hallmark through 1992, none of the exhibits listed by Paper Corporation supports its contention that Schoeller had a binding obligation to "continue to sell Hallmark its requirements through Paper Corporation at least through the year 2004."

Final Pretrial Order 25.

### 2. Admitted Evidence

■ In 1979 Paper Corporation began distributing Schoeller paper products in markets other than the photographic paper market.[5] Paper Corporation's accounts for Schoeller's paper included the Minnesota Mining and Manufacturing Company ("3M") and Avery International Fasson Division ("Fasson"). Sometime in 1981 Schoeller decided to sell directly to 3M, and in January 1989 Schoeller advised Paper Corporation of its intent to terminate their distributor relationship and to market its products directly to Hallmark and Fasson.

In *Schoeller I*, the Court granted Schoeller's motion to dismiss Paper Corporations breach of contract claim regarding sales to Fasson and all other customers except Hallmark, the only claim that was litigated at trial.

After allowing the jury to hear testimony regarding the sale of Schoeller's paper to 3M, the Court concluded that the 3M dealings were too remote in time to have any significant probative value, and to the extent that they confirmed a course of conduct that would preclude direct sales to Paper Corporation's customers, they were cumulative. Thus, in order to reduce the number of issues and documents to be considered, the jury was instructed accordingly, and both parties were precluded from offering evidence relating to the 3M business.

Schoeller contends that the admission of testimony regarding the Fasson business was prejudicial because Paper Corporation's claim regarding Fasson had been dismissed in *Schoeller I* along with the claim regarding the 3M business.

Schoeller and Paper Corporation had a twenty-four year history of dealing with each other in the greeting card business, during which time Schoeller never sold greeting card paper other than through Paper Corporation to Paper Corporation's customers. Thus, the evidence and testimony relating to the relationship between Schoeller and Paper Corporation had probative value in helping the jury to understand the parties' relationship at the time they entered into agreements in 1987 and 1988 despite the fact that the breach of contract claim against Fasson had been dismissed.[6]

---

**5.** Paper Corporation began distributing Schoeller products to manufacturers of greeting cards in 1964. *See Schoeller I*, 724 F.Supp. at 111.

**6.** Bishop testified on cross-examination that since 1965: (i) Schoeller never sold greeting card paper to anyone by Paper Corporation, (ii) Paper Corporation bought all of Schoeller's greeting card paper at Schoeller's prices, and (iii) Paper Corporation never offered any other

Unlike the testimony and evidence regarding 3M, that regarding Fasson was timely and relevant for the jury's consideration. Therefore, the Court did not err in admitting and allowing the jury to consider evidence and testimony regarding the Fasson business.

### 3. Special Verdict Form

Schoeller alleges that it was denied a fair trial because the Special Verdict Form did not conform precisely to the jury charge insofar as Interrogatory Number 1 addressed only Schoeller's unilateral commitment to sell, making no reference to Paper Corporation and Hallmark's corresponding obligations. This allegation is without merit.

The jury answered "yes" to Interrogatory Number 1 of the Special Verdict Form, which read:

> In 1987 or 1988, did Paper Corporation and Schoeller enter into an agreement pursuant to which Schoeller agreed that Paper Corporation would serve as its exclusive sales agent and that it would supply Hallmark, through Paper Corporation, with a stated quantity of greeting card paper, at a price set according to an agreed upon formula, for an ascertainable period of time?

Tr. 863.

In order to find the existence of an agreement, the jury was required to follow the Court's instructions regarding the term "agreement". The charge had explicitly clarified the elements of consideration and the mutuality of obligations that are required for an enforceable agreement. There is no requirement that the Court recharge the jury on the definition of each term used in an interrogatory on the Special Verdict Form.

■■■■ The Second Circuit has made clear that when evaluating the adequacy of special interrogatories, the interrogatories must be "considered in conjunction with the district court's charge." *Cutlass Prod., Inc. v. Bergman*, 682 F.2d 323, 327 (2d Cir.1982). Special interrogatories conform to the required standards when, "con-

sidered in conjunction with the district court's charge," "they *clearly* present the material fact issues raised by the pleadings and evidence." *Id.*

Therefore, because the interrogatories on the Special Verdict Form, considered in conjunction with the jury instructions, fairly and clearly submitted the issues of consideration and the mutuality of obligations to the jury as essential to the finding of an agreement, Schoeller's claim that it was denied a fair trial as a result of the special interrogatories necessarily fails.

### 4. Conclusion

Each of Schoeller's allegations regarding errors made by the Court during the course of the trial—allegations regarding the inadequate definition of the issues at trial, the Court's failure to give a corrective instruction regarding testimony and evidence related to the Fasson business, and the apparent inconsistency between the jury charge and the Special Verdict Form, fails to be substantiated in the analysis Schoeller offers. As a result, none of these allegations constitutes a ground on which Schoeller's motion for a new trial can be granted.

### C. *The Jury Verdict was Not Excessive*

■■■ A district court has the authority, pursuant to Rule 59, Fed.R.Civ.P. to set aside an excessive verdict and order a new trial on damages when the quantum of damages found by a jury is *clearly* outside the maximum limit of a reasonable range. *See Reinertsen v. George W. Rogers Constr. Corp.*, 519 F.2d 531, 532 (2d Cir. 1975); *Taylor v. Washington Terminal Co.*, 409 F.2d 145, 149, *cert. denied*, 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 85 (1969); *Cosentino v. Royal Netherlands S.S. Co.*, 389 F.2d 726 (2d Cir.), *cert. denied*, 393 U.S. 977, 89 S.Ct. 441, 21 L.Ed.2d 438 (1968).

■■■ Schoeller does not allege that a defect in the jury instructions infected jury

paper to any customer to whom it sold Schoel-  ler paper.

deliberations on the issue of damages.[7] Rather, Schoeller contends that the verdict returned in Paper Corporation's favor is excessive and requires the drastic corrective action of a new trial because it awarded almost all of the losses claimed by Paper Corporation for the period of 1989 through 1992 as calculated by Paper Corporation's damages expert, Mary Woodford ("Woodford").

Schoeller's proofs at trial and in support of this motion call into question the methodology employed by Woodford in calculating the damages to which she testified, asserting that the "conservative" calculations of its accounting expert, Schnackel, were more sound. However, this difference of opinion between experts over the calculation of damages does not constitute a difference between an excessive and a reasonable award. The difference of opinion here is not so extreme as to cast one side, to wit, Paper Corporation, beyond the pale of reasonableness.

Schoeller would have the Court set aside the jury's verdict on the ground that "Woodford's calculations were replete with error and represented a blatant attempt to maximize plaintiff's damages." Defs.' Mem. 42. A reasonable jury, which took into consideration Woodford's testimony and opinions in light of the entirety of Paper Corporation's proofs and most importantly in light of Schoeller's cross-examination of Woodford and the expert rebuttal testimony it presented, could have found Woodford to be a credible witness and agreed with her methodology and opinions.

There is nothing on this record that supports Schoeller's assertion that Woodford's calculations were so blatantly erroneous and her assumptions so seriously flawed that the jury's verdict inflicted a grave injustice on Schoeller. The quantum of damages found by the jury was not *clearly* outside the maximum limit of a reasonable range, and therefore the relief Schoeller requests is not justified.

7. Thus, Schoeller's reliance on *Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 47 (2d Cir.1984) is misplaced.

*Conclusion*

For the foregoing reasons, Schoeller's motion for a judgment as a matter of law or, in the alternative, for a new trial is denied.

It is so ordered.